# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

STEVEN H. HALL            )
       *Plaintiff,*        )
                   )
v.                     )        Civil Action No. 1:18-cv-00461-JEB
                   )
KIRSTJEN M. NIELSEN    )
    *Defendants et al.,*    )
                   )        Date:  July 24, 2018

## SECOND AMENDED COMPLAINTS

## I.    PRELIMINARY STATEMENT

The Plaintiff does <u>not</u> seek judicial review of decision of the Merit Systems Protection Board (MSPB)

for *Steven Hall v. Depart of Homeland Security*, MSPB Docket No. DC-0752-15-1063-I-1, (June 23, 2016) and

*Steven Hall v. Depart of Homeland Security*, Docket No. DC-0752-14-0243-I-1, (June 23, 2016).  Plaintiff

alleges employment and disability discrimination, and retaliation; failure to gainfully employ, denied reasonable

accommodation, workers' compensation, unwarranted termination, and misrepresentation) under Title VII, Civil

Rights Act of 1964, as amended, 42 U.S.C. 2000e seq, and Rehabilitation Act, 29 USC 791 et seq.

## II.    JURISDICTION AND VENUE

The Plaintiff need not exhaust administrative remedies under the Rehabilitation Act.  See *Minter v.*

*District of Columbia*, 62 F. Supp. 3d 149, 164-65 (D.D.C. 2014)("This Court agrees, and holds that 'the ADA's

exhaustion requirement does not apply to the Rehabilitation Act[.]'").  This District Court has subject matter

jurisdiction over the Plaintiff's mixed-cases pursuant to 5 U.S.C. 7703(b)(2)" See *Perry v. MSPB*, 137 S. Ct.

1975, 1978, 198 L. Ed 2d 527, 533, 2017 U.S. LEXIS 4044 (June 23, 2017)("Kloeckner announced a clear rule:

'[M]ixed cases shall be filed in district court.") citing *Kloeckner v. Solis*, 133 S. Ct. 596, 603-04, 607, 184 L. Ed.

2d 433 (2012).  Venue is proper pursuant to 28 U.S.C.1391 (b)(2) and 28 U.S.C.1391(e)(1)(B).

III.    LIMITATION PERIOD

Defendants willfully discriminated against Plaintiff less than three years ago from November 2015 to the

present date, Title VII, Civil Rights Act of 1964 statute of limitations is three years.  The Rehabilitation Act of

1973 does not contain statute of limitations, and thus the limitations period must be borrowed from the state

cause of action most analogous to a plaintiff's claim. See, e.g., *Gaona v. Town & Country Credit*, 324 F.3d

1050, 1054-55 (8th Cir. 2003) (discussing the framework for borrowing state statute of limitation).  In the

District, this limitations period is three years, and thus a three-year limitation period is applied in Rehabilitation

Act cases.  See *Long v. Howard Univ.*, 512 F. Supp. 2d 1, 11-12 (D.D.C. 2007).

IV      PARTIES

(1) Plaintiff Steven H. Hall is a former GS-12 employee of the Defendant agency. Mr. Hall has been

unemployed from November 18, 2013 to October 4, 2015 and from October 28, 2016 to present date.  Plaintiff's

termination from Federal service expires after five years on November 18, 2018.

(2) Defendant Department of Homeland Security (DHS) is an agency of the United States government

located at 3801 Nebraska Avenue Complex, NW, Washington, DC 20016. Defendant Agency Office of General

Counsel (OGC) attorney, Letitia Byers-Yates worked and collaborated with Defendant FELSC attorney(s).

(3) Defendant Rosemary Dettling, attorney and  owner of Federal Employees Legal Services Center

(FELSC) at 1629 K Street, NW, Suite 300, Washington, DC 20006.  Her phone number is (202) 390-4741.

V.      FACTS

Plaintiff's Facts are listed under Exhibit (N).

VI.     COMPLAINT ALLEGATIONS

Plaintiff's COUNTS I through XXVI are listed under Exhibit (O).

VII.    REMEDIES

Plaintiff's remedies are listed under Exhibit (P).

VIII.   <u>EVIDENCE AND CLARIFICATION</u>

Workers' Compensation Discrimination

Defendant OGC attorney (Byers-Yates) requested from OWCP to handle Plaintiff's workers' compensation claims to justify wrongful charges of AWOL by Plaintiff's former supervisors (Chris Mills). Defendant Agency wrongfully charged Plaintiff 896.5 hours Absent Without Leave (AWOL) from November 21, 2012, through October 17, 2013. The Office of Workers Compensation Programs (OWCP) paid Plaintiff benefits while he was in a Leave Without Pay (LWOP)/OWCP Injury status for 1296.5 hours from September 23, 2012, through June 10, 2013. Defendants Agency ignored Plaintiff's respiratory illness and injury status and charge Plaintiff AWOL knowingly he was recuperating from his medical illnesses at home. Plaintiff's former supervisor (Mr. Mills and Roy Neigh) deliberately provided OWCP a biased, untimely, and insufficient Air Quality Sample Report (AQSR) for which did not include direct air quality testing regarding comfort; heat, cold, and moistness, nor provided indirect air quality testing regarding health; respiratory issues. See Exhibit A. Defendant Agency OGC attorneys and Plaintiff's former supervisors collaborated in collusion to violate Title V, Section 8151, Part 353 and Federal Employees Compensation Act (FECA).

Unwarranted Termination

Defendant Agency terminated Plaintiff from Federal service citing (1) failure to follow instructions, (2) failure to follow leave procedures, (3) AWOL. Exhibit B. Plaintiff did not fail to follow instruction because his Veterans Affairs (VA) and family doctors did not release him back to work at St. Elizabeth's (St. E's) construction site and Defendant Agency did not issue Plaintiff a required Eligibility Job Offer (EJO) letter in

writing.  Exhibit C.  Plaintiff was not required to follow leave procedures because he was in an LWOP/OWCP

Injury status, and should not have been charged AWOL as confirmed by Exhibit A.  Defendant Agency refused

to issue Plaintiff an EJO letter, but chose to charge Plaintiff 896.5 hours of AWOL.  Exhibit B is invalid.

Defendant Agency OGC and FELSC attorneys were aware that Plaintiff termination from Federal service was

unwarranted.  Exhibit D.  Defendant Agency refused to rehabilitate, nor reinstate Plaintiff into his former job

position by violating 5 C.F.R., Section V, 8151, Part 353 and Rehabilitation Act of 1973.  Exhibit E.

## Disability Discrimination

Defendant Agency and FELSC attorneys fail to acknowledge Plaintiff's respiratory conditions

that included rhinitis, bronchial spasms, reactive airway disease, sleep apnea, and mental health issues.  Plaintiff

filed four cases with OWCP; 252515109 (respiratory), 252515038 (mental stress), 032135157 (retaliation/

emotional distress), but a claim for (musculoskeletal condition) was not processed.  See *Hall v. Department of

Labor*, 16-00846-KBJ, pp1-23, dated December 13, 2016.  Defendant Agency provided OWCP an Air Quality

Sample Report (AQSR) date September 28, 2012 - October 1, 2012, in May 2013.  The AQSR was more than

200 days old and should not have been accepted by OWCP after 45 days elapsed.  Defendant Agency refused to

engage with Plaintiff regarding email proposals to remove him from a noxious (dusty) working environment at

St. E's.  Exhibit F.  Agency discrimination forced Plaintiff to apply for unemployability with VA and disability

insurance with Social Security Administration. Exhibit G.  Agency violated the Rehabilitation Act of 1973 and

Health Insurance Portability and Accountability Act (HIPAA) of 1996.

## Employment Discrimination

Plaintiff was in (1) AWOL, (2) administrative leave with pay, (3) indefinite suspension, and (4) LWOP/

OWCP Injury status from November 21, 2012, through June 10, 2013.  It was illegal for Defendant Agency to

take disciplinary actions against Plaintiff by charging AWOL during this entire period. The Defendant Agency

4

did not support Plaintiff in an attempt by assigning him into several vacant job positions. Defendant Agency

ignored Federal Employees Compensation Act (FECA) to include FECA 8-2; Retention Rights, 8-4;

Reemployment with the Agency, 8-5; Vocational Rehabilitation Services, and 5 U.S.C. 8151, Part 353 that

required an EJO letter in writing to the Plaintiff. Defendant Agency was required to return Plaintiff to his

GS-12 job position or its equivalent. Defendant Agency former Employee Relations confirm that Plaintiff was

to return to his duty station at St. E's. Plaintiff's former supervisor testified that Plaintiff clearance was restored

and taken off the DNA List on September 13, 2013. See *Hall v. Department of Homeland Security*, EEO Case

No. HS-HQ-26832-2016, pp000147 and 000178. Defendant Agency refuse to reassign Plaintiff into several

requested vacant job positions. See Exhibit H. Plaintiff endured blatant employment discrimination.

IX.    AGREEMENTS

Settlement Breach Term Agreement (SBTA)

Defendants FELSC attorneys did not inform Plaintiff about the settlement breach term agreement

(SBTA) that was emailed to Defendant OGC attorney. See Exhibit I. Defendant FELSC attorneys illegally

appease Defendant OGC attorneys to obtain a guaranteed award fee of $30,000. Defendants FELSC attorneys

created the discriminating SBTA to ensure Plaintiff would not be reinstated into his former job position.

Plaintiff was not aware of collusion between Defendant Agency and FELSC attorneys regarding the illegal

SBTA for which invalidated the SA before Plaintiff had an opportunity to review and sign.

Settlement Agreement (SA)

Defendant (Dettling) charged Plaintiff $12,349 for a prehearing report. Exhibit J, p1 and refused

to attend an MSPB hearing. Exhibit J, p3, para 3. Dettling admitted that she would reimburse Plaintiff $15,500

if he accepted an agency settlement offer. Dettling falsely informed Plaintiff that MSPB AJ would find against

him. Plaintiff filed an EEO complaint due to denied reasonable accommodation and mentioned age

discrimination in case complaint HS-HQ-00478-2013/EEOC No. 570-2013-00968X. Defendant Dettling was

Plaintiff designated representative. Exhibit K. Defendants attorneys did not inform MSPB administrative judge

(AJ) that Plaintiff had raised age discrimination complaints.

Plaintiff was not aware of OWBPA/ADEA being included in after he had signed SA. Defendant OGC

attorneys (Byers-Yates) forgot to add ADEA in SA, but falsely stated Plaintiff did not raise age discrimination

complaints. Plaintiff did not sign SA a third time. Exhibit L. Defendant Dekker (co-attorney) photocopied

Plaintiff's signature and forwarded a fraudulent SA to MSPB AJ. Agency and FELSC attorneys were aware that

case complaints HS-HQ-00478-2013/570-2013-00968X was listed in SA as EEOC complaint #2.

X.     SETTLEMENT REFUND

Defendant FELSC attorney was unprofessional and insinuated that Plaintiff was a "nuisance" and

refuse to reimburse a settlement refund of $15,500. Exhibit J, p5, para 2. Defendant FELSC attorney continued

to sue Plaintiff for $30,268.80 and threatening him with a lien on his home and garnishment order for future

earnings. Exhibit M. The threats and discrimination by Defendants attorneys exacerbated Plaintiff's medical

conditions and mental health issues. The Plaintiff was forced to file bankruptcy. See U.S. Bankruptcy Court,

District of Maryland, *Hall Bankruptcy Petition #17-26827* and Plaintiff remains unemployed to this date.

XI.     COLLUSION

Defendant Agency and FELSC attorneys collaborated in collusion to deceive and manipulate Plaintiff

regarding workers' compensation, disability, and employment discrimination, unwarranted termination,

fraudulent settlement agreement, SBTA, and misrepresentation. Defendant Agency and FELSC attorneys

provided a fraudulent settlement to MSPB AJ and this prevented employment opportunities and a return to the

Agency. Also, FELSC attorneys were guaranteed an award fee of $30K while colluding against Plaintiff.

### XII.   MISREPRESENTATION

Defendant Agency and FELSC attorneys collaborated in discriminating and unethical conduct to deny

Plaintiff reasonable accommodation and workers' compensation benefits, resulting in disability discrimination,

unwarranted termination, and employment discrimination. Defendant attorneys eradicated Plaintiff's career

employment opportunities in Federal government and private sector.  Plaintiff's quality of life and financial

stability was permanently damaged due to Defendant FELSC and DHS OGC attorneys.  All discriminatory

actions against Plaintiff resulted in exacerbating his medical conditions and mental health issues.  Defendant

FELSC and DHS OGC attorneys collaborated in an unfair due process that violated Fifth and Fourteenth

Amendments and Rules of Professional Conduct; Rules 1.5 (fees) and 8.4 (misconduct).  Agency and FELSC

attorneys retaliate against Plaintiff, an unemployed Veterans Affairs, Service-connected Disabled Veteran.

Exhibit Q is supports Facts under Exhibit N.

### XIII.   FEDERAL RULES OF CIVL PROCEDURE (RULE) 12(b)(6)

Plaintiff has cited Title VII, Civil Rights Act of 1964 and Rehabilitation Act of 1973 and states a claim

for denial of reasonable accommodation and workers' compensation, unwarranted termination, employment and

disability discrimination, and request that relief is granted against Agency, Dettling, and FELSC.

### XIV.   REQUESTED REMEDY

Plaintiff is not seeking review of MSPB Dockets DC-0752-14-0243-I-1 and DC-0752-15-1063-I-1, not

seeking reinstatement in Defendant Agency, nor requesting that the settlement agreement is set aside. Plaintiff

seeks from Defendants $573,411.80 (untaxed) in compensatory and punitive damages.  Exhibit P.

### XV.   DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial regarding his complaints.

Respectfully,

STEVEN H. HALL

7141 Chesapeake Village Blvd
Chesapeake Beach, MD  20732
Cellular (301) 801-6506
Steven.H.Hall@comcast.net

## CERTIFICATE OF SERVICE

I certify that on July 24, 2018, a copy of this case complaint was provided to this court and a copy provided to all parties as follows:

Agency
U. S. Department of Homeland Security,
Office of General Counsel Mail Stop 0485
245 Murray Lane, SW
Washington, DC 20528
Work (202) 282-9822
Facsimile (202) 282-9186

FELSC
Rosemary Dettling
1629 K Street, NW, Suite 300
Washington, DC 20006
Work (202) 390-4741
Fax: (202) 379-9772
Email: RDettling@FELSC.com

July 24, 2018
   (Date)

STEVEN H. HALL, Plaintiff/Pro Se
7141 Chesapeake Village Blvd
Chesapeake Beach, MD 20732
Steven.H.Hall@comcast.net
(301) 801-6506

US DEPT OF LABOR, OWCP
PO BOX 8300 - DISTRICT 25
LONDON, KY 40742-8300

# United States Department of Labor
### Division of Federal Employees' Compensation

# BENEFIT STATEMENT

STEVEN H HALL
7141 CHESAPEAKE VILLAGE BLVD
CHESAPEAKE BEACH    MD 20732

DEPARTMENT OF HOMELAND SECURITY
MANAGEMENT DIRECTORATE
CHCO-HRMS-WORKERS' COMP COORDINAT
245 MURRAY LANE, SW, STOP 0175
WASHINGTON        DC 20528

| | | | |
|---|---|---|---|
| Case Number: | 25-2510109 | Gross Compensation: | 24,421.61 |
| Social Security Number: | 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 | Less Deductions: | 140.49 |
| Date of Injury: | 12/08/04 | Intermittent Hours Lost: | .00 |
| Pay Type: | 1 | Overpayments: | .00 |
| Check Date: | 13/03/29 | Other Payees: | .00 |
| Period Paid: 12/09/23 To: 13/02/18 | | Net Check Amount: | 24,281.12 |
| Pay Rate: | 1,535.95 | Agency Health Insurance Cost: | .00 |
| Comp Rate: | .7500 | Health Insurance Code: | N/A |
| Life Insurance | 140.49 | From:              To: | |

# NOTICE TO RECIPIENTS

METHOD OF PAYMENT  If you are receiving payment by electronic fund transfer (EFT), the payment shown above has already been made to your financial institution. Otherwise, the check is enclosed.

ADDRESS CHANGE  If you move or otherwise change your mailing address or your check mailing address (such as a bank or credit union), advise OWCP right away in writing of the new address.

CORRESPONDENCE  Include your OWCP file number on all letters you send to OWCP.

DEPENDENTS  For recipients of payments for disability or schedule award (pay type 1 or 9, as shown above):  If you have one or more dependents, you are entitled to compensation at the augmented rate of 75%, rather than 66 2/3 percent. of your pay rate. (Questions as to who qualifies as a dependent should be directed to the OWCP District Office handling your claim.) Events such as birth, death, marriage, divorce, separation. or youngest child reaching age 18 may affect your compensation and should be reported to OWCP right away.

EMPLOYMENT  For recipients of payments for disability (pay type 1, as shown above): To avoid an overpayment of compensation, advise OWCP right away when you return to full-time or part-time work with either a government or private employer (including self-employment.) Return to OWCP any compensation checks received after you go back to work. State the full name and address of your employer; the date employment began; the rate of pay and number of hours worked per week; and a description of the employment.

SURVIVORS  For recipients of payments for death benefits (pay type 7, as shown above):  If it has not already done so. OWCP will advise you in detail of each survivor for whom death benefits are payable. and the percentage of salary payable for each. (Questions as to who qualifies as a survivor should be directed to the OWCP District Office handling your claim.) Events such as birth of a posthumous child, death, remarriage, or youngest child reaching age 18 may affect your compensation and should be reported to OWCP right away.

1                    Exhibit  (A)



U.S. DEPARTMENT OF LABOR
200 CONSTITUTION AVE. N.W.
OWCP ROOM C-3514
WASHINGTON DC 20210

# United States Department of Labor
## Division of Federal Employees' Compensation

# BENEFIT STATEMENT

STEVEN H HALL
7141 CHESAPEAKE VILLAGE BLVD
CHESAPEAKE BEACH    MD 20732

US DEPT OF LABOR, OWCP
PO BOX 8300 - DISTRICT 25
LONDON, KY 40742-8300

| | | | |
|---|---|---|---|
| Case Number: | 25-2510109 | Gross Compensation: | 5,299.03 |
| Social Security Number: | 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 | Less Deductions: | 29.23 |
| Date of Injury: | 12/08/04 | Intermittent Hours Lost: | .00 |
| Pay Type: | 1 | Overpayments: | .00 |
| Check Date: | 13/05/03 | Other Payees: | .00 |
| Period Paid: 13/02/27 | To: 13/03/29 | Net Check Amount: | 5,269.80 |
| Pay Rate: | 1,535.95 | Agency Health Insurance Cost: | .00 |
| Comp Rate: | .7500 | Health Insurance Code: | N/A |
| Life Insurance | 29.23 | From:           To: | |

# NOTICE TO RECIPIENTS

METHOD OF PAYMENT  If you are receiving payment by electronic fund transfer (EFT), the payment shown above has already been made to your financial institution. Otherwise, the check is enclosed.

ADDRESS CHANGE  If you move or otherwise change your mailing address or your check mailing address (such as a bank or credit union), advise OWCP right away in writing of the new address.

CORRESPONDENCE  Include your OWCP file number on all letters you send to OWCP.

DEPENDENTS  For recipients of payments for disability or schedule award (pay type 1 or 9, as shown above):  If you have one or more dependents, you are entitled to compensation at the augmented rate of 75%, rather than 66 2/3 percent, of your pay rate.  (Questions as to who qualifies as a dependent should be directed to the OWCP District Office handling your claim.) Events such as birth, death, marriage, divorce, separation, or youngest child reaching age 18 may affect your compensation and should be reported to OWCP right away.

EMPLOYMENT  For recipients of payments for disability (pay type 1, as shown above): To avoid an overpayment of compensation, advise OWCP right away when you return to full-time or part-time work with either a government or private employer (including self-employment.) Return to OWCP any compensation checks received after you go back to work. State the full name and address of your employer; the date employment began; the rate of pay and number of hours worked per week; and a description of the employment.

SURVIVORS  For recipients of payments for death benefits (pay type 7, as shown above):  If it has not already done so, OWCP will advise you in detail of each survivor for whom death benefits are payable, and the percentage of salary payable for each. (Questions as to who qualifies as a survivor should be directed to the OWCP District Office handling your claim.) Events such as birth of a posthumous child, death, remarriage, or youngest child reaching age 18 may affect your compensation and should be reported to OWCP right away.

2                              EX    (A)

File Number: 252510109
CA-1042-NO-0

U.S. DEPARTMENT OF LABOR

OFFICE OF WORKERS' COMP PROGRAMS
PO BOX 8300 DISTRICT 25 WAS
LONDON, KY 40742
Phone:  (202) 513-6800

June 10, 2013

Date of Injury: 08/04/2012
Employee:  STEVEN H. HALL

STEVEN H HALL
7141 CHESAPEAKE VILLAGE BLVD
CHESAPEAKE BEACH, MD 20732

Dear Mr. HALL:

Your claim for compensation benefits has been disallowed for the reason stated in the enclosed copy of the formal decision.  This was based on all evidence of record and on the assumption that all available evidence has been submitted.  If you disagree with the decision, you may follow any one of the courses of action outlined on the attached appeal rights.

Further medical treatment at OWCP expense is not authorized and prior authorization, if any, is hereby terminated.

Your employing agency will charge the previously paid Continuation of Pay (COP) to your sick and/or annual leave balance.  If you do not have a leave balance, the money already paid as COP will be declared an overpayment.

Any compensation payment received after the indicated termination date must be returned to the Office of Workers' Compensation Programs.

Sincerely,

Charmayne Browne
Senior Claims Examiner

Enclosures: Formal decision with appeal rights

DEPARTMENT OF HOMELAND SECURITY
MANAGEMENT DIRECTORATE
CHCO-HRMS-WORKERS' COMP COORDINATOR
245 MURRAY LANE, SW, STOP 0175
WASHINGTON, DC 20528

3                    EX    (A)

*If you have a disability (a substantially limiting physical or mental impairment), please contact our office/claims examiner for information about the kinds of help available, such as communication assistance (alternate formats or sign language interpretation), accommodations and modifications.*



November 6, 2012

Mr. James Hodges
GSA Safety Environment and Fire Protection Branch
301 7th Street, S.W., Room 2080
Washington, D.C.  20407

RE:   **Indoor Air Quality Monitoring**
      *Homeland Security Department - St. Elizabeth's Complex*
      2701 Martin Luther King Avenue, S.E.
      Washington, D.C.

      TTL Arc Environmental, JV Job Number: 8742.24/988-1


Dear Mr. Hodges,

In accordance with our on-call contract with the General Services Administration (GSA), TTL Arc Environmental, JV, LLC performed indoor air quality monitoring in three trailers at the Department of Homeland Security (DHS) Saint Elizabeths Campus located at 2701 Martin Luther King Avenue, S.W., Washington, D.C.  The project involved area sampling for indoor air quality parameters including temperature, relative humidity, carbon dioxide, carbon monoxide, total volatile organic compounds, respirable dust, particulate characterization, viable fungi, and viable bacteria; the survey was conducted in response to occupancy concerns regarding indoor air quality.

Certified Industrial Hygienist (CIH), Mr. Edmond VandenBosche measured conditions with direct reading meters and collected samples for viable fungi analysis on September 28, 2012.  Samples for viable bacteria were collected on October 1, 2012.  A TSI VelociCalc (Model 9565 P) affixed with a TSI Model 982 probe was used to measure temperature (Temp), relative humidity (RH), carbon dioxide ($CO_2$), and carbon monoxide (CO).  A mini-Rae 2000 photoionization detector with a 10.6 eV lamp was used to measure total volatile organic compounds (TVOCs).  A TSI DustTrak II was used to measure respirable dust (Resp).  An inlet conditioner with a 50% cut point of four microns was used to sample only the respirable dust and exclude larger particles.  Results for parameters measured with direct reading meters are presented in Table 1.

| Table 1 Results for Direct Reading Instrument Measurements | | | | | | |
|---|---|---|---|---|---|---|
| Location | Date @ Time | Temp (°F) | RH (%) | $CO_2$ (ppm) | CO (ppm) | VOCs (ppm) | Resp (mg/m³) |
| HMD 1 | 9/28/12 @ 14:11 | 82.4 | 40.7 | 553 | 1.4 | 0.0 | 0.028 |
| HMD 2 | 9/28/12 @ 14:52 | 74.4 | 67.6 | 286 | 0.0 | 0.0 | 0.019 |
| Outdoor by HMD1 & 2 | 9/28/12 @ 14:43 | 79.0 | 53.8 | 184 | 0.1 | 0.0 | 0.033 |
| Security Trailer | 10/1/12 @10:39 | 72.8 | 49.4 | 585 | 0.0 | 0.0 | 0.018 |
| Outdoor by Security Trailer | 10/1/12 @ 10:18 | 67.8 | 50.1 | 136 | 0.4 | 0.0 | 0.042 |

*Mr. James Hodges*
*Homeland Security Department – St  Elizabeth's Complex – IAQ Testing*
*November 6. 2012*
*Page 2*

TTL Arc Environmental collected one viable bacteria and one viable fungal sample from each of the three trailers, in addition to one set of outdoor samples for comparison purposes.  During the survey, occupants of the Security Trailer reported that previous moisture intrusion events had occurred within the trailer.

Samples for bacteria and fungi were collected using a one-stage bioaerosol sampler with a flow rate of 28.3 liters per minute for a five minute sampling period.  The sampler was wiped down with alcohol prior to collecting each sample.  Bacteria samples were collected on petri dishes containing tryptic soy agar. Bacteria were cultured at EMSL in Cinnaminson. New Jersey.  Results for bacteria are presented in Table 2.

| Table 2 Bacteria Sample Results in CFU/m$^3$ | | | | | |
|---|---|---|---|---|---|
| Type of Bacteria | HMD1 | HMD2 | Outdoors by HMD 1 & 2 | Security Trailer | Outdoors by Security Trailer |
| Bacillus sp. | 147 | 77 | 21 | 140 | |
| Bacillus cereus | | | 28 | | |
| Bacillus megaterium | | | | 42 | |
| Gram positive Coccobacillus | 14 | | | | |
| Pantoea agglomerans | | | | 28 | |
| Staphylococcus cohnii | | | | | 7 |
| Total | 161 | 77 | 49 | 210 | 7 |

Fungal samples were collected on petri dishes containing malt extract agar.  Fungi were cultured by either EMLab P & K in San Bruno, California or by EMSL Analytical in Cinnaminson. New Jersey. Results for fungi are presented in Table 3.

| Table 3 Fungal Sample Results in CFU/m$^3$ | | | | | |
|---|---|---|---|---|---|
| Type of Fungus | HMD1 | HMD2 | Outdoors by HMD 1 & 2 | Security Trailer | Outdoors by Security Trailer |
| Artrhospore - former | | 14 | | | |
| Aspergillus fumigatus | | | | 21 | |
| Aspergillus niger | | | | | 7 |
| Aspergillus oryzae | | | | | 7 |
| Aspergillus sydowii | | | | 7 | |
| Aureobasidium sp. | | | | | |
| Aureobasidium pullulans | | | 7 | | |
| Bipolaris / Drechslera group | | 21 | | | |
| Cladosporium sp. | | 28 | | | |
| Cladosporium cladosporides | 220 | | 560 | 56 | 196 |
| Cladosporium sphaerospermum | | | | 63 | |
| Curvularia sp. | | | | 7 | |
| Non-sporulating fungi | 7 | | 14 | | |

Ex  A

| Table 3 Fungal Sample Results in CFU/m$^3$ | | | | | |
|---|---|---|---|---|---|
| **Type of Fungus** | **HMD1** | **HMD2** | **Outdoors by HMD 1 & 2** | **Security Trailer** | **Outdoors by Security Trailer** |
| Penicillium sp. | | | | | |
| Penicillium Chrysogenum | | | | | 14 |
| Penicillium glabrum | 7 | | 14 | 7 | 7 |
| Penicillium implicatum | | | | 7 | 21 |
| Penicillium mineoluteum | | | | 7 | |
| Pithomyces sp. | | | | 7 | |
| Rhizopus stolonifer | 7 | | | | |
| Sporothrix sp. | | | | 7 | |
| Sterile dark | | | | 7 | |
| Sterile white | | | | 35 | 35 |
| **Total** | 240 | 64 | 590 | 231 | 287 |

Settled dust was sampled by vacuuming an unmeasured area using a 28 mm cassette with a 0.8 micron mixed cellulose ester filter. Samples were submitted to either EMLab P & K in San Bruno, California or to EMSL in Cinnaminson, NJ. Particles were analyzed by direct microscopic examination. Results are presented in Table 4.

| Type of Particle | HMD2 |
|---|---|
| Algae | - |
| Amorphous Debris | 45 |
| Animal Hair | 3 |
| Cellulose Fibers | 13 |
| Crystalline Particles | - |
| Epithelial Cells | 10 |
| Fern, Moss, Etc. | 1 |
| Fungal Spores | 2 |
| Glass Fiber | 1 |
| Human Hair | - |
| Hyphal Fragments | 1 |
| Insect Parts | 1 |
| Mites | - |
| Other | 12 |
| Pollen | 2 |
| Starch Particles | 1 |
| Synthetic Fibers | 9 |

**Discussion and Conclusions**

The American Society of Heating, Refrigeration, and Air Conditioning Engineers (ASHRAE) standard 62.1 recommends that indoor carbon dioxide remain below the outdoor concentration plus 700 ppm. All tests were within this range.

6                                    Ex   A

ASHRAE standard 55 recommends that indoor summer temperatures range between 73° F and 79° F and that winter temperatures range between 68° F and 74° F to keep most occupants comfortable. Temperatures with the HMD1 and HMD2 trailers were above the ASHRAE recommended temperature for occupant comfort; if occupants express discomfort with the warmth of the trailer(s), the thermostats should be adjusted to provide ambient conditions with ASHRAE recommended guidelines.

ASHRAE standard 55 recommends that indoor humidity levels be maintained between 30% and 60% relative humidity. One reading collected from within HMD 2 was 67.7%. All other readings were within the recommended range. When humidity exceeds 60%, the potential for condensation and microbial growth increases. The relative humidity within the trailers should be controlled to prevent potential microbial growth.

EPA air quality standards require carbon monoxide to be below 9 ppm as an 8-hour average. All readings were below this level.

Volatile organic compounds were not detected within the trailers during the sampling events. VOCs in indoor air should be kept as low as reasonably achievable.

The American Council of Governmental Hygienists (ACGIH) recommends that respirable particulates be maintained below 3 mg/m$^3$. All readings collected from within the trailers were below the ACGIH recommended threshold.

The bioaerosol samples collected on the day of the survey contained low bacteria and mold concentrations.

The mold concentrations ranged from 64 to 240 CFU/m$^3$ (Colony Forming Units Per Cubic Millimeter). The fungi concentrations were below the level detected outside (287 CFU/m$^3$ for the security trailer and 590 CFM/m$^3$ for outside of HMD 1 and 2). Additionally, the indoor mold concentrations were below the OSHA Technical Guideline level of 1,000 CFU/m3.

The bacteria concentrations ranged from 77 to 210 CFU/m$^3$. The bacteria concentration outside was 49 CFU/m$^3$ by HMD 1 and 2 and 7 CFU/m$^3$ by the Security Trailer. Indoor counts are considered to be normal for occupied areas, and do not indicate inadequate ventilation or indoor amplification sites.

The particulate characterization indicated that nearly half of the dust volume is amorphous debris (non-biological). The optical evaluation of the particulate did not indicate significant levels of fungal spores or other notable particulate. Minimal settled particulate was observed within the trailers.

All of the parameters measured are within standard indoor air quality guidelines.

EX A

**EMLab P&K**
1150 Bayhill Drive, Suite 100, San Bruno, CA 94066
(866) 888-6653  Fax (650) 829-5852  www.emlab.com

Client: TTL Associates, Inc.
C/O: Ed Vandenbosche
Re: 8742.24; GSA, St Eliz, IAQ

Date of Sampling: 10-01-2012
Date of Receipt: 10-03-2012
Date of Report: 10-05-2012

## PARTICULATE CHARACTERIZATION - DIRECT MICROSCOPIC EXAMINATION REPORT

| Location: | HMD2:<br>HMD 2, settled dust | Security:<br>Security trailer, settled dust |
|---|---|---|
| Comments (see below) | None | None |
| Lab ID-Version‡: | 4364060-1 | 4364061-1 |
| | Percentage (%)† | Percentage (%)† |
| Algae | | |
| Amorphous debris | 45 | 40 |
| Animal hair | 3 | 2 |
| Cellulose fibers | 13 | 18 |
| Crystalline particles | | |
| Epithelial (skin) cells | 10 | 10 |
| Fern, moss, etc. | 1 | |
| Fungal spores | 2 | 2 |
| Glass fiber | 1 | 1 |
| Human hair | | |
| Hyphal fragments | 1 | 1 |
| Insect parts | 1 | 2 |
| Mites | | |
| Other (wood, trichome, etc.) | 12 | 9 |
| Pollen | 2 | 2 |
| Starch particles | | 1 |
| Synthetic fibers | 9 | 12 |

Comments:

† The percentages reported are approximate values.
Interpretation is left to the company and/or persons who conducted the field work.
‡ A "Version" indicated by -"x" after the Lab ID# with a value greater than 1 indicates a sample with amended data.  The revision number is reflected by the value of "x".
EMLab P&K, LLC

8                    Ex A

TTL Arc Environmental JV is pleased to have performed this indoor air quality assessment for GSA.  If you have any questions please call us at (410) 659-9971.

Sincerely,
**TTL / Arc Environmental JV, LLC.**

Edmond R. VandenBosche, CIH, CSP
Project Certified Industrial Hygienist

Stacy Kahatapitiya, CHMM, LEED GA
Project Manager

9                    EX   A

Attachment 12

**From:** Mills, Chris
**Sent:** Wednesday, November 07, 2012 2:13 PM
**To:** Eskridge, Gloria; Neigh, Roy; Lane, Kathleen; House, Robert L; Coles, John
**Subject:** FW: Indoor Air Quality Report
**Importance:** High

All,

FYI...attached is the air quality report for the DHS trailers at St. Elizabeths.

v/r
Chris

Chris Mills, P. E.
DHS Headquarters
Management Directorate
Chief Readiness Support Office (CRSO)  - Formerly Chief Administrative Office
Operations Support, Director Technical Support and St. Elizabeths Program
Manager
(202) 329-8782 (cell)
Email: Chris.Mills@hq.dhs.gov

**From:** Carraway, Camille
**Sent:** Wednesday, November 07, 2012 11:25 AM
**To:** Mills, Chris
**Cc:** Anderson, Kari
**Subject:** Indoor Air Quality Report

The TTL/Arc Environmental JV report on the St. Elizabeth's trailers was forward to us from GSA yesterday.  There was a delay in report submission due to the laboratory performing additional speciation tests on the biological samples.   This required two additional weeks.

The industrial hygienist collected  a variety of samples that are used to assess air quality and identify substances that could produce allergic reactions.   The following tests/measurements were made:

Fungi
Bacteria
Volatile Organic Compounds
Respirable Dust in Air
Analysis of Settled Dust
Temperature

Roy Neigh
HS-HQ-00478-2013
Page 48 of 80

Initials

10

Exhibit A



November 6, 2012

Ms. Camille Carraway, CIH
Safety & Health
Department of Homeland Security
800 North Capitol Street, N.W. – Suite 500
Washington, D.C.  20536

RE:   **Indoor Air Quality Assessment**
      ***Homeland Security Department***
      650 Massachusetts Avenue, N.W.
      Washington, D.C.  20001

      TTL Arc Environmental JV Job Number: 8742.24/988-1


Dear Ms. Carraway,

The Department of Homeland Security (DHS) contracted TTL Arc Environmental, JV, LLC to perform an indoor air quality assessment within select areas of the DHS office located at 650 Massachusetts Avenue, N.W., in Washington, D.C.   The project involved area sampling for indoor air quality parameters including temperature, relative humidity, carbon dioxide, carbon monoxide, viable fungi, and viable bacteria.  Supplemental sampling was conducted at the

Certified Industrial Hygienist (CIH), Mr. Edmond VandenBosche measured conditions with direct reading meters and collected samples for viable fungi analysis on September 28, 2012.  Samples for viable bacteria were collected on October 2, 2012.

A TSI model 9565 P with a model 982 probe was used to measure temperature (Temp), relative humidity (RH), carbon dioxide ($CO_2$), and carbon monoxide (CO).

A mini-Rae 2000 photoionization detector with a 10.6 eV lamp was used to measure total volatile organic compounds (VOCs).

A TSI DustTrak II was used to measure respirable dust (Resp).  <u>An inlet conditioner with a 50% cut point of 4 microns was used to sample only the respirable dust and exclude larger particles.</u>

Results for parameters measured with direct reading meters are presented in Table 1.

Samples for bacteria and fungi were collected using a one-stage bioaerosol sampler with a flow rate of 28.3 liters per minute for a 5-minute sampling period.  The sampler was wiped down with alcohol prior to collecting each sample.  Bacteria samples were collected on petri dishes containing tryptic soy agar.  Bacteria were cultured at EMSL in Cinnaminson, NJ.  Results for bacteria are presented in Table 2.

Ms. Camille Carraway
Homeland Security Department – 650 Massachusetts Avenue – IAQ Testing
November 6, 2012
Page 2

Fungal samples were collected on petri dishes containing malt extract agar. Fungi were cultured by either EM Lab P & K in San Bruno, CA or by EMSL in Cinnaminson, NJ. Results for fungi are presented in Table 3.

Settled dust was not sampled based on not observing accumulations of dust sufficient to sample.

| Table 1 | | | | | | |
| Results for Direct Reading Instrument Measurements | | | | | | |
| Location | Date @ Time | Temp ($^\circ$F) | RH (%) | $CO_2$ (ppm) | CO (ppm) | VOCs (ppm) | Resp (mg/m³) |
|---|---|---|---|---|---|---|---|
| 4th Floor Cube 14 | 9/28/12 @ 12:24 | 75.6 | 50.1 | 880 | 1.0 | 0.0 | 0.013 |
| Loading Dock | 9/28/12 @ 12:50 | 78.9 | 60.6 | 268 | 0.0 | 0.6 | 0.081 |

| Table 2 | | | | |
| Bacteria Sample Results in CFU/m³ | | | | |
| Type of Bacteria | 4th Floor Cube 14 | Loading Dock | | |
|---|---|---|---|---|
| Pseudomonas putida | 168 | >2400 | | |

| Table 3 | | | | |
| Fungal Sample Results in CFU/m³ | | | | |
| Type of Fungus | 4th Floor Cube 14 | Loading Dock | | |
|---|---|---|---|---|
| Cladosporium cladosporides | 7 | 200 | | |
| Non-sporulating fungi | | 21 | | |
| Penicillium variabile | | 7 | | |
| | | | | |
| Total | 7 | 228 | | |

**Discussion and Conclusions**

The American Society of Heating, Refrigeration, and Air Conditioning Engineers (ASHRAE) standard 62.1 recommends that indoor carbon dioxide remain below the outdoor concentration plus 700 ppm. All tests were within this range.

ASHRAE standard 55 recommends that indoor summer temperatures range between 73 F and 79 F and that winter temperatures range between 68F and 74 F to keep most occupants comfortable. Temperatures were within this range.

12                                    EX A

*Ms. Camille Carraway*
*Homeland Security Department – 650 Massachusetts Avenue – IAQ Testing*
*November 6, 2012*
*Page 3*

ASHRAE standard 55 recommends that indoor humidity levels be maintained between 30% and 60% relative humidity. All readings were within the recommended range.

EPA air quality standards require carbon monoxide to be below 9 ppm as an 8-hour average. All readings were below this level.

Volatile organic compounds were not detected in the work area. This is acceptable.

The American Council of Governmental Hygienists (ACGIH) recommends that respirable particulates be maintained below 3 mg/m$^3$. All readings are below this level.

The bioaerosol samples collected on the day of the survey contained low bacteria and mold concentrations.

The mold concentration indoors was 7 CFU/m3 (Colony Forming Units Per Cubic Meter). The fungi concentrations were far below the level detected outside (228 CFU/m3). Additionally, the indoor mold concentrations were below the OSHA Technical Guideline level of 1,000 CFU/m3.

The bacteria concentration indoors was 168 CFU/m3. The bacteria concentration outside was >2400 CFU/m3.

Indoor counts for both fungi and bacteria are considered to be normal for occupied areas, and do not indicate inadequate ventilation or indoor amplification sites.

Arc Environmental is pleased to have performed this air monitoring and analysis for GSA. If you have any questions please call us at (410) 659-9971.

Sincerely,
**TTL / Arc Environmental JV, LLC.**

Edmond R. VandenBosche, CIH, CSP
Project Certified Industrial Hygienist

Stacy Kahatapitya
Project Manager

13                                        EX  A

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| HALL, STEVEN H | 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 | 07/25/65 | 11/18/13 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code 330 | 5-B. Nature of Action REMOVAL | 6-A. Code | 6-B. Nature of Action |
| 5-C. Code V6J | 5-D. Legal Authority 5 USC 75 POSTAPPT | 6-C. Code | 6-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| ADMINISTRATIVE SPECIALIST 90340853 018709 | |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19.Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 0301 | 12 | 03 | 79,864.00 | PA | | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| 64,292.00 | 15,572.00 | 79,864.00 | .00 | | .00 | | .00 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| IMMEDIATE OFFICE OF THE SECRETARY<br>Under Secretary for Management<br>Off of the Chief Admin Officer<br>Hq Management & Development | <br><br>7A<br>HS OS0207050000000000  PP 23 2013 |

## EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 6  1 - None  3 - 10-Point/Disability  5 - 10-Point/Other<br>2 - 5-Point  4 - 10-Point/Compensable  6 - 10-Point/Compensable/30% | 1  0 - None  2 - Conditional<br>1 - Permanent  3 - Indefinite | | YES [X] NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| D0  BASIC-STANDARD | 3  RETM | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K  FERS AND FICA | 08/02/10 | F  FULL TIME | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1  1 - Competitive Service  3 - SES General<br>2 - Excepted Service  4 - SES Career Reserved | E  E - Exempt<br>N - Nonexempt | | 8888 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON  DIST OF COLUMBIA  DC |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

**45. Remarks**
SF-8 ISSUED TO EMPLOYEE.
SF-2819 WAS PROVIDED. LIFE INSURANCE COVERAGE IS EXTENDED FOR 31 DAYS
DURING WHICH YOU ARE ELIGIBLE TO CONVERT TO AN INDIVIDUAL POLICY (NON-
GROUP CONTRACT).
FORWARDING ADDRESS=
7141 CHESAPEAKE VILLAGE B CHESAPEAKE BEACH MD 20732
LUMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE.
REASON(S) FOR REMOVAL: FAILURE TO FOLLOWING INSTRUCTIONS; FAILURE TO
FOLLOW LEAVE PROCEDURES AND AWOL.

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| HOMELAND SECURITY | E/S BY: ESRA OZBEN |
| 47. Agency Code HS OS | 48. Personnel Office ID 5500 | 49. Approval Date 12/04/13 | EXECUTIVE DIRECTOR, HRMS |

2 - OPF Copy - Long-Term Record - DO NOT DESTROY
This is an 'official' document generated from the EHRI eOPF system.

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6238

Exhibit (B)



Federal Employees Compensation Act (FECA)

FECA; 8-4(D)

current location. The agency must ensure that any position offered will be available for the entire period allowed for response to the offer.

D.   *Elements of Job Offer.*  The agency may contact the employee by telephone to advise that the job is available but the offer must be confirmed in writing within two business days.  A copy of the offer must be sent to OWCP at the same time.  The offer should include:

(1)  A description of the duties to be performed;

(2)  The specific physical requirements of the position and any special demands of the workload or unusual working conditions;

(3)  The organizational and geographical location of the job;

(4)  The date on which the job will be available;

(5)  The date by which a response to the job offer is required.

The agency should not, however, request election of OPM benefits if the employee declines the job offer.  OWCP is solely responsible for obtaining such an election.

E.   *Advising the Employee.*  If the employee does not accept the job,  OWCP will make a suitability determination. If the job is deemed unsuitable, OWCP will advise the employing agency of the reasons. If the job is found to be suitable, OWCP will notify the employee in writing and advise that he or she is expected to accept the job or to show reasonable cause for refusal. OWCP will advise the employee that failure to accept the job or respond within 30 days will result in termination of compensation payments.

F.   *Employee Response.* If the employee responds to the agency, a copy should be forwarded to OWCP.

Exhibit (C)

## SUPPORTING DOCUMENTATION FOR MSPB HEARING

Dettling stated; "***Mr. Hall did not have any evidence to show that his termination was warranted..Because I knew Mr. Hall would not win his case...and the fact that he had no helpful witness testimony***." Both statements are false and a witness was irrelevant as follows:

From September 23, 2012 to March 29, 2013, from April 1-19, 2013,  and from September 13-30, 2013, DHS, my former employer wrongly charged **896.5** hours (112 days) Absent Without Leave (AWOL).  From September 23, 2012 to March 29, 2013, I was paid workers' compensation (WC) and this nullified 683 hours (85 days) of AWOL.  From September 23, 2012 to June 10, 2013, Office of Workers' Compensation Programs (OWCP) placed me in a Leave Without Pay (LWOP)/OWCP Injury status **1,296.5** hours (162 days).  From April 1-19, 2013, DHS charged **120** hours (15 days) of AWOL by default.  From September 13-30, 2013, DHS charged **96** hours (12 days) of AWOL by default. There was **213.5** hours (27 days) of non-consecutive days charged AWOL by default.  **The LWOP/OWCP Injury status (162 days) exceeded AWOL (112 days), termination by DHS was NOT warranted**.

-*Maria Bair v. Department of Defense*, February 16, 2012, p7 states; "***the Board has long recognized that an adverse action based on an AWOL charge cannot be sustained if OWCP determines that the employee was entitled to compensation benefits as a result of a work-related injury for the entire time period charged as AWOL***."  DHS charged Hall AWOL by default knowingly that OWCP had refused to approve his claim for compensation benefits from April 1, 2013 to April 26, 2013.  From May 13, 2013 to September 30, 2013, DHS Disability Program Manager granted me reasonable accommodation and stated that Hall was a "***qualified individual with a disability***"  On September 10, 2013, Hall access to classified information was reinstated proving that he did not threatened DHS employees.

-From July 23-24, 2013, Hall faxed Dettling supporting documentation to win the case.  Dettling was aware that Hall documentation carried more weight than witness testimony.  **FELSC attorneys ignored LWOP/OWCP Injury status days, reasonable accommodation, and WC days**.  From September 12-13, 2013, Hall was in a indefinite suspension, Return to Duty, and AWOL status in less than 24 hours. **DHS denied him from returning to his former job position**.  On November 20, 2015, during the prehearing conference, MSPB AJ (Hudson) stated; "***I can automatically rule in the agency behalf if the AWOL is 30 consecutive days***".  The AWOL by default was in April 2013 and September 2013 for (27-days) non-consecutively.  Dettling abandoned Hall and she did not participate in the MSPB prehearing conference on November 23, 2015.  Dettling should have required Dekker to participate in the scheduled MSPB termination hearing on December 3, 2015.

1                                          Exhibit(D)

Steven Hall

Sent to Ms Dettling on Tue Nov 03, 2015 05:45 PM
Message : DHS falsified my time sheet and charged me AWOL based on insufficient air quality tests. Also, DHS never completed worker's compensation forms CA 16, CA 17, CA 20 nor issues me an Eligibility Job Offer letter, and they denied me reasonable accommodations. I guess that I have no rights,that's  not fair due process.

Received from Ms Dettling on Tue Nov 03, 2015 05:37 PM
Message : I talk to the judge today. She called me and I called her back. She wanted to talk about settlement. She said that she didn't think that you would win yo

Sent to Ms Dettling on Tue Nov 03, 2015 04:23 PM
Message : First choice is the maximum  $300 if they don't want me back in DHS. Second choice is GS13 Step 10 and $150k. Third choice is GS12 Step 10 and $300k. All money tax free. Steven Hall

2

EX (D)

Federal Employees Compensation Act (FECA)

work.  In accordance with 5 U.S.C. 8106, which provides for payment of compensation to partially disabled employees, OWCP will make every reasonable effort to arrange for employment of such employees.  These efforts will concentrate initially on the employing agency.  Only if reemployment with the agency is not possible will OWCP attempt to place the employee with a new employer.

## 8-2. Retention Rights

→ Under 5 U.S.C 8151, an employee who recovers within one year of starting compensation has mandatory rights to his or her old position or its equivalent, regardless of whether he or she is still on the agency rolls. If full recovery occurs after one year, or the employee is considered partially recovered, he or she is entitled to priority consideration as long as application is made within 30 days of the date compensation ceases.

Such employees incur no loss of benefits which they would have received but for the injury or disease.  The regulations on retention rights are contained in 5 CFR Section 353, 301, 302, and 303.  These sections of the regulations, as well as 5 U.S.C. 8151 are administered by OPM, not OWCP.

Any period of time during which an employee receives compensation from OWCP is credited to the employee for the purposes of determining rights and benefits based upon length of service, including eligibility for retirement.

An employee who has applied for and been approved for Federal retirement benefits is no longer considered an employee and any reemployment is covered by OPM rules and regulations for reemployed annuitants.  This is true even if the employee never actually received a Federal retirement annuity.

OWCP's case management procedures emphasize return to work before the expiration of the employee's one-year entitlement to the same or an equivalent job.

Exhibit E

✳ FECA; 8-4

ensure that proper medical care is being provided and to assist employees in returning to work.

OWCP refers for services all employees with approved traumatic injury claims who have continuing disability and, on a selective basis, employees with approved occupational illness claims who have continuing disability.

   A.   *Contacting the Interested Parties.* FNs may contact claimants, attending physicians and/or employing agencies to address claimants' questions concerning medical care; to obtain treatment plans, return to work plans, return to work dates and descriptions of work limitations; and to arrange return to work.

   B.   *Return to Work.* Conference calls may be held to arrange for return to work. Such calls should always include agency officials. When and employee returns to work the FN may accompany him or her on a walk through of the job to ensure that the duties are within the employee's medical limitations and that both the employee and the supervisor understand the limitations.

   C.   *Agency Nurses.* FNs may occasionally coordinate care with agency nurses. As a rule, however, agencies should not assign their own nurses to work with employees simultaneously with OWCP RNs.

## 8-4.   Reemployment with the Agency

→ When the medical evidence shows that total disability has ended the agency is encouraged to consider reemployment. The following procedures apply to all employees still on the agency's rolls, regardless of how long they have received compensation.

   A.   *Medical Evidence.* To make a job offer the agency will need medical evidence describing the employee's medical limitations. (In some cases OWCP can provide this information.) Medical reports which address current limitations will usually suffice for this purpose. If the employee refuses to provide sufficient medical information for the agency to evaluate whether a job offer is appropriate , the agency should advise OWCP.

2                                        Ex (E)

FECA; 8-5

(1) Acceptance.  If the employee accepts the job, the agency should notify OWCP as soon as possible of the date of return to duty so as to avoid overpayments of compensation.  Effective the date of return to duty, compensation will be terminated, if no loss of pay has resulted, or reduced, if the new job pays less than the old.

(2) No Response.  If no answer is received, OWCP will terminate benefits and issue a formal decision on the basis that the employee has refused suitable work.

(3) Refusal with No Explanation.  If the employee refuses the offer without explanation, OWCP will terminate benefits and issue a formal decision.

(4) Refusal with Explanation.  If the employee refuses the offer and provides reasons in support of the refusal, OWCP will evaluate them and determine whether reasonable cause has been shown.  If so, OWCP will advise the employing agency and compensation will continue at a level reflecting the degree of disability while further attempts at placement are made.  If not, OWCP will advise the employee and allow him or her an additional 15 days to return to work. If the employee still does not return to work, OWCP will terminate benefits and issue a formal decision.

Returning employees to gainful employment requires close cooperation between agencies and OWCP.  Early notification of job offers and complete information about the offers aids OWCP in making its decisions.  For its part, OWCP recognizes its responsibility to evaluate job offers promptly and advise employees of their rights and responsibilities in a timely manner so as to avoid undue delays.

## 8-5.  Vocational Rehabilitation Services

The FECA at 5 U.S.C. 8104 provides for vocational rehabilitation services to assist disabled employees in returning to gainful employment consistent with their physical, emotional and educational abilities.  An employee with extended disability may be considered for rehabilitation services if requested by the attending physician, the employee or

3

Ex (E)

# 5 U.S. Code § 8151 - Civil service retention rights

(a) In the event the individual resumes employment with the Federal Government, the entire time during which the employee was receiving compensation under this chapter shall be credited to the employee for the purposes of within-grade step increases, retention purposes, and other rights and benefits based upon length of service.

(b) Under regulations issued by the Office of Personnel Management—

(1) the department or agency which was the last employer shall immediately and unconditionally accord the employee, if the injury or disability has been overcome within one year after the date of commencement of compensation or from the time compensable disability recurs if the recurrence begins after the injured employee resumes regular full-time employment with the United States, the right to resume his former or an equivalent position, as well as all other attendant rights which the employee would have had, or acquired, in his former position had he not been injured or disabled, including the rights to tenure, promotion, and safeguards in reductions-in-force procedures, and

(2) the department or agency which was the last employer shall, if the injury or disability is overcome within a period of more than one year after the date of commencement of compensation, make all reasonable efforts to place, and accord priority to placing, the employee in his former or equivalent position within such department or agency, or within any other department or agency.

(Added Pub. L. 93–416, § 22, Sept. 7, 1974, 88 Stat. 1149; amended Pub. L. 95–454, title IX, § 906(a)(2), Oct. 13, 1978, 92 Stat. 1224.)

Exhibit (E)

4

5 CFR 353.301

agencywide and applies for a period of 1 year from the date eligibility for compensation begins. After 1 year, the individual is entitled to the rights accorded individuals who fully or partially recover, as applicable.

**(d) _Partially recovered._** Agencies must make every effort to restore in the local commuting area, according to the circumstances in each case, an individual who has partially recovered from a compensable injury and who is able to return to limited duty. At a minimum, this would mean treating these employees substantially the same as other handicapped individuals under the Rehabilitation Act of 1973, as amended. (See 29 U.S.C. 791(b) and 794.) If the individual fully recovers, he or she is entitled to be considered for the position held at the time of injury, or an equivalent one. A partially recovered employee is expected to seek reemployment as soon as he or she is able.

1   **Start Download - View PDF**
Convert From Over 1 PDF, PDF to Text Simply With The Free Online App!

2   **Free Employee Manual - State Specific and Easy to Use**
development and Word Document Creation, Customized, and Print for Free!

About LII

Contact us

Advertise here

Help

Terms of use

Privacy

5

Ex (E)

# XFINITY Connect

## Response to Formal Leave Restrictions and Reasonable Accommodations Proposal

**From :** Steven Hall <Steven.Hall@HQ.DHS.GOV>

Mon, Apr 29, 2013 01:39 PM

**Subject :** Response to Formal Leave Restrictions and Reasonable Accommodations Proposal

**To :** 'Steven Hall' <Steven.h.hall@comcast.net>

**From:** Steven.H.Hall@comcast.net [mailto:Steven.H.Hall@comcast.net]
**Sent:** Monday, March 04, 2013 9:02 AM
**To:** Mills, Chris
**Cc:** Eskridge, Gloria; Cutitta, Irene; rpatick@jpcattorneys.com; Eicholtz, Erika; Couch, Howard; Steven Harold Hall; Hall, Steven
**Subject:** Response to Formal Leave Restrictions and Reasonable Accommodations Proposal

Mr. Mills,

-I received your FedEx package in regards to Formal Leave Restrictions that highlighted LWOP and AWOL, but these restrictions are inconsistent, unrealistic, and harassing to say the least. You had stated that my attendance made it difficult for my management chain of command and that others had to step in during my absence to complete my work, but my return confirmed otherwise. On February 19, 2013, I returned after almost six months I had identified all of HMD records management file plan and scheduling on the first day. The others that you mentioned did not accomplished anything and the same dust still remained since August 29, 2013. However, what troubles me the most is that you failed to mention that DHS General Counsel stated that you would discuss expectations or professionalism, ground rules about following DHS policies and directives to include formal leave restrictions. You fail to provide me an updated Position Description, Individual Development Plan, and/or discuss with me my performance appraisal/career development. Your ultimate focus was to penalized and disciplined me for getting sick on the job at St. Elizabeth's construction site.

-I plan and continue to engage in an interactive process with you, Ms. Eskridge, and Ms. Cutitta (HR Employee Relations) regarding my disabilities as an qualified employee that is a Indirect/Direct threat in regards to safety during an emergency (respiratory and mental health (mental impairment).

-As HR Employee Relations is aware that EEOC has put in place a methodical process that justifies an interactive process. Being forced to return and remain to St. Elizabeth's construction site imposes an undue psychological hardship on me. I am proposing a reasonable accommodation proposal that will help in alleviating my issues as follows:
-I request that the current allergy/dusk mask be replaced by a more secure mask because there are openings at the bottom and top of the mask and my glasses continues to fog up. I can't see my computer screen and this hinders me from accomplishing my job to the best of my abilities. In addition, the mask limits me from driving while on St. Elizabeth's construction site arriving and departing for home. The mask is causing migraine-like headaches and constriction from the mask causes shortness of breath, exhaustion and this leads to sickness (vomiting), thus, undue psychological hardship.

-Proposal #1

-At an location other than St. Elizabeth's, I am requesting that (1) an physician and/or other licensed health care professional administer/perform a medical evaluation using an Occupational Safety & Health Administration medical questionnaire (Appendix C to 1910.134), (2) provide a fit test, (3) fit test exercise, (4) require retesting of respirator.

-Proposal #2

-I request that I am detailed and/or temporarily reassigned to help in alleviating my respiratory and mental health issues.

-Proposal #3

-I request that I am granted episodic telework and/or administrative excused absence leave; telework was directed by management regarding Ms. Cutitta's alleged sexual harassment investigation from March 2012 through June 2012.

-Proposal #4

-I request that I am granted episodic telework and/or administrative excused absence leave for the remainder of March 2013 and April

1                              Exhibit (F)

2013 while I am being treated by an Veterans Affairs Psychiatrist.

-Again, your leave restrictions are harassing and there is no incentives in regards to earning an performance bonus and/or recognition for the next six months through August 2013. Lastly, you, Ms Eskridge, and Ms Cutitta have all collaborated while brainstorming to either force me out and/or terminate me from the Federal government. The facts remain that my career development and health issues are irrelevant to you, Ms Eskridge, and Ms Cutitta, but to return back to work only to sort through records files from FY2004 through FY2013 (10 years) is your ultimate concern.

-The HMD records management is an essential function, but the HMD files were deliberately neglected for at least the past five years from prior Federal employees and these employees were never held accountable, but were promoted to GS13/GS14 and reassigned to 650 Mass Avenue. The records are 90 percent administrative files to include cartoons clipping and pictures of men drinking beer while standing in the middle of a swamp and these files range from FY2004 through FY2008 requires destruction, and the remaining 10 percent of the files are duplications of maps, drawings, and budget information that has long served its purpose.

-This confirms once again that CRSO, HMD, and HR Employee Relations doesn't respect while discriminating against me a service-connected veterans by wasting my talent and education regarding a dead-end job. No one is supporting me in any capacity regarding to my career development and health issues, but trying to salvage your own reputations and careers. Mr. Shenandoah Titus is an Anti-Harassment Coordinator who works closely with HR Employee Relations and he can only advise/recommend information for which I have absolutely no trust due to his loyalty for the agency. Closing: your formal leave restrictions are harassing, punishable, and discriminatory to include retaliation and reprisal by all to include CRSO, HMD, and HR Employee Relations.

Steven Hall

Z          EX (F)

OMB Approved No. 2900-0404
Respondent Burden: 45 minutes
Expiration Date: 10/31/2020

**VA** Department of Veterans Affairs

(DO NOT WRITE IN THIS SPACE)
(VA DATE STAMP)

# VETERAN'S APPLICATION FOR INCREASED COMPENSATION BASED ON UNEMPLOYABILITY

**NOTE:** This is a claim for compensation benefits based on unemployability. When you complete this form you are claiming total disability because of a service-connected disability benefits. Answer all questions fully and accurately. See mail/fax information on page 3 of this form.

**Social Security Benefits:** Individuals who have a disability and meet medical criteria may qualify for Social Security of Supplemental Security Income disability benefits. If you would like more information about Social Security benefits, contact your nearest Social Security Administration (SSA) office. You can locate the address of the nearest SSA office in your telephone book blue pages under "United States Government, Social Security Administration" or call 1-800-772-1213 (Hearing Impaired TDD line 1-800-325-0778.). You may also contact SSA by Internet at http://www.ssa.gov/.

## SECTION I - VETERAN IDENTIFICATION INFORMATION

NOTE: You can *either* complete the form online or by hand. If completed by hand print the information requested in ink, neatly, and legibly to expedite processing the form.

1. NAME OF VETERAN *(FIRST, MIDDLE INITIAL, LAST)*

STEVEN H HALL

2. VETERAN'S SOCIAL SECURITY NUMBER

● ● ● – ● ● – 5 8 4 0

3. VA FILE NUMBER

● ● ● ● ● 5 8 4 0

4. DATE OF BIRTH *(MM,DD,YYYY)*

| Month | Day | Year |
|-------|-----|------|
| 07 | 25 | 1965 |

5. MAILING ADDRESS OF VETERAN *(No. and street or rural route, city or P.O., State, ZIP Code and Country)*

No. & Street: 7141 CHESAPEAKE VILLAGE BLVD

Apt./Unit Number: ____   City: CHESAPEAKE BEACH

State/Province: MD   Country: US   ZIP Code/Postal Code: 20732 – 4127

6. EMAIL ADDRESS *(If applicable)*

Steven.H.Hall@comcast.net

7. TELEPHONE NUMBER *(Include Area Code)*

(301) 801-6506

## SECTION II - DISABILITY AND MEDICAL TREATMENT

8. WHAT SERVICE-CONNECTED DISABILITY PREVENTS YOU FROM SECURING OR FOLLOWING ANY SUBSTANTIALLY GAINFUL OCCUPATION?

**Adjustment Disorder with depressed mood; (Mental Health) Anxiety and Depression.** Also, emotional distress. SH

9. HAVE YOU BEEN UNDER A DOCTOR'S CARE AND/OR HOSPITALIZED WITHIN THE PAST 12 MONTHS?

[X] YES   [ ] NO

10. DATE(S) OF TREATMENT BY DOCTOR(S)

| FROM | TO |
|------|-----|
| 03/01/2013 | Present |

11. NAME AND ADDRESS OF DOCTOR(S)

**Dr. Racha, Dr. .C. Jentgen, and Dr. S. Warraich**

**Veterans Affairs, Medical Center
50 Irving St., NW
Washington, DC 20422**

12. NAME AND ADDRESS OF HOSPITAL

13. DATE(S) OF HOSPITALIZATION

| FROM | TO |
|------|-----|
|  |  |

## SECTION III - EMPLOYMENT STATEMENT

14. DATE YOUR DISABILITY AFFECTED FULL-TIME EMPLOYMENT

| Month | Day | Year |
|-------|-----|------|
| 08 | 03 | 2012 |

15. DATE YOU LAST WORKED FULL-TIME

| Month | Day | Year |
|-------|-----|------|
| 10 | 28 | 2016 |

16. DATE YOU BECAME TOO DISABLED TO WORK

| Month | Day | Year |
|-------|-----|------|
| 08 | 03 | 2012 |

17A. WHAT IS THE MOST YOU EVER EARNED IN ONE YEAR?

$ ●,000.00

17B. WHAT YEAR?

| Year |
|------|
| 2009 |

17C. OCCUPATION DURING THAT YEAR

**Administrative Assistant**

VA FORM
OCT 2017   **21-8940**

SUPERSEDES VA FORM 21-8940, FEB 2016,
WHICH WILL NOT BE USED.

Page 1

Exhibit (G)

# Cover Sheet for steven hall

I have applied for disability online. I understand that the information I provided and sent to SSA electronically will be used in making a decision on this claim for benefits.

**My address:**

7141 Chesapeake
Village Blvd
Chesapeake Beach, MD 20732

**My phone number:**

(301) 801-6506

**When necessary, SSA can contact this person who knows about my condition:**

Anita Gatling-Hall

7141 Chesapeake
Village Blvd
Chesapeake Beach, MD 20732

(301) ●●●-●●●●

**I have attached the following items (check all that apply):**

☐ Copies of Medical Records I Already Have

☐ Other (Please list below)

**Name of the person completing this application:**

steven hall

**Mail to:**

SOCIAL SECURITY
6110 ALLENTOWN ROAD
SUITLAND , MD 20746-4552

2                    $Ex (G)$

**XFINITY Connect**                                                       **Steven.H.Hall@comcast.net**

+ Font Size -

**Rotational Assignments - Vacancies in DHS**

**From :** Steven Hall <Steven.H.Hall@comcast.net>                        Fri, Nov 15, 2013 10:42 AM

**Subject :** Rotational Assignments - Vacancies in DHS                   📎2 attachments

**To :** Jeffery Orner <Jeffery.Orner@hq.dhs.gov>

**Cc :** Irene Cutitta <Irene.Cutitta@hq.dhs.gov>, Kathleen Lane <Kathleen.Lane@hq.dhs.gov>, Steven Harold
Hall <steven.h.hall@comcast.net>, steven hall <steven.hall@hq.dhs.gov>

Mr. Orner,

Prior to you making a decision regarding the Notice of Proposal for Removal from the Federal service.  I
am requesting that you provide me another opportunity in regards to reasonable accommodation, this
reasonable accommodation will allow me to remain employed and start over in another job position and
help in enhancing my career development within DHS.

On May, 9 2013, Ms. Cutitta stated as quote; "A reassignment search will be conducted by another
individual at OCHCO who can determine what position you qualify for, and what vacancies are available
based on the information you provided.  Ms. Lane and I are not in the position to perform those
functions.  Therefore, someone from OCHCO will reach out to you shortly."

I trusted that Ms. Cutitta would make sure that someone from OCHCO would reach out to me because
this led me to believe that reasonable accommodation would be provided.  After my access to classified
information/material was reinstated on August 30, 2013, I had assumed that Ms. Cutitta and someone
from OCHCO would still reach out to me.  Reasonable accommodation was granted to me on May 13,
2013 by Kathy Lane, CRCL Disability Manager for the Department.

I am currently earning my second Masters degree in Human Resource Management as Strayer University
in Alexandria, Virginia and will graduate in June 2014.   I feel that my education, military, and Federal
government experience is an asset for several vacant positions in DHS.

I have provided you an Rotational Assignment Listing (8 pages) of vacant job positions throughout DHS
as stated in the attachment.  I greatly appreciate your consideration if you would grant me a second
opportunity in DHS.

Steven Hall

📄 **Rotational Assignments 1-4 and 6-8.pdf**
4 MB

📄 **Rotational Assignment 5.pdf**
472 KB

Exhibit (H)

ATTACHMENT

| From: | Rosemary Dettling |
|---|---|
| To: | Byers, Letitia |
| Cc: | JDekke@felsc.com |
| Subject: | Re: Hall, MSPB Appeal No. DC-0752-14-0243-I-1 |
| Date: | Saturday, November 21, 2015 12:09:39 AM |

Hi Ms. Byers:

I was in a hearing today and was not able to participate in the teleconference with Judge Hudson. I was happy to hear the parties were close to settling.

I wanted to update you on some things. After work today, Mr. Hall reached out to me and Ms. Dekker. He said he was grateful the agency was willing to settle, but he had serious reservations about settling without having the termination expunged from his record. While he is currently working at the Department of the Navy, his job is a "not to exceed one year" position. It ends next September 2016. He is very worried that at the end of that term he will be unemployed and will not be able to find a new job. He has a family to support and he is worried about their future.

As a former federal employee, I know that it is virtually impossible for a fired federal employee to get another federal job when they have a termination in their record. In fact, it is difficult to get any job, as most private sector employers also ask prospective employees if they have been terminated.

I know the agency's settlement offer was exceedingly generous. Please don't get me wrong. However, I can't help but agree with Mr. Hall that it is very important to get the termination out of his record.

I know that the agency does not want to do this and I can appreciate the agency's reservations. I have been his representative for the last few years and I know that he has done certain things that the agency finds annoying and/or threatening.

Please consider this. I believe we can agree to other terms that would appease the agency, while allowing Mr. Hall to work again. If the agency agrees to rescind the termination, Mr. Hall will agree (in writing) to never apply to the agency again. He will agree to: never contact the agency officials again; to cease and desist from sending letters to the agency; and to never threaten any agency employees. He will also agree to keep the settlement terms and the termination confidential. That stipulation would prohibit Mr. Hall from bad-mouthing the agency in any forum, publicly or privately. He understands that he would be required to reimburse the agency the 85k if he breaches these terms.

Please pass this request on to the settlement official and let me know if you would like to discuss these terms. We are open to other suggestions and are hopeful that this case can be resolved.

*Settlement Breach Term Agreement (SBTA)*

Rosemary Dettling, Esq.
Federal Employee Legal Services Center
1629 K Street, NW
Suite 300
Washington, DC 20006

*Exhibit (I)*



**Federal Employee Legal Services Center**
**1629 K Street, N.W.**
**Suite 300**
**Washington, DC 20006**
**United States**
**Phone: 202-390-4741**
**Email: billing@felsc.com**

Invoice submitted to:

Steven Hall - MSPB
7141 Chesapeake Village Blvd
Chesapeake Beach, MD 20732
United States

| | |
|---|---|
| Invoice # | 20090 |
| Invoice Date | 01/16/2016 |
| For Services Through | 01/01/2016 |
| Terms: | N/A |

| Date | Init | Description | Rate | Amount |
|---|---|---|---|---|
| 09/23/2015 | RD | *Legal Work*<br>Read Motion to Dismiss; Discussed w/ client | 0.26 at $ 530.00/hr | $ 137.80 |
| 10/05/2015 | RD | *Legal Work*<br>Read Failure to Serve Order; discussed w/ client | 0.26 at $ 530.00/hr | $ 137.80 |
| 10/07/2015 | RD | *Legal Work*<br>Read order to show cause | 0.20 at $ 530.00/hr | $ 106.00 |
| 10/07/2015 | RD | *Legal Work*<br>Read agency Notice of Designation | 0.11 at $ 530.00/hr | $ 58.30 |
| 10/10/2015 | RD | *Legal Work*<br>Read Initial Decision, reviewed docs for prehearing report, started initial draft of prehearing report | 4.20 at $ 530.00/hr | $ 2,226.00 |
| 10/15/2015 | JD | *Legal Work*<br>Drafted response to show cause | 0.40 at $ 530.00/hr | $ 212.00 |
| 11/13/2015 | JD | *Legal Work*<br>Conf w/ client, review file | 0.70 at $ 530.00/hr | $ 371.00 |
| 11/16/2015 | JD | *Legal Work*<br>Review file | 3.00 at $ 530.00/hr | $ 1,590.00 |
| 11/17/2015 | JD | *Legal Work*<br>Rev. proposed witness list, review emails, draft prehearing, submit notice of representation | 4.25 at $ 530.00/hr | $ 2,252.50 |
| 11/18/2015 | RD | *Legal Work*<br>Read client emails | 0.22 at $ 530.00/hr | $ 116.60 |
| 11/19/2015 | RD | *Legal Work*<br>Read agency pre hearing submission | 0.40 at $ 530.00/hr | $ 212.00 |
| 11/19/2015 | RD | *Legal Work*<br>Read and responded to emails from Joanne re case | 0.22 at $ 530.00/hr | $ 116.60 |
| 11/19/2015 | RD | *Legal Work*<br>Reviewed appellant's pre hearing report; Discussed w/ Joanne | 0.42 at $ 530.00/hr | $ 222.60 |
| 11/19/2015 | JD | *Legal Work*<br>Rev/respond to email, review client info, revise prehearing | 2.75 at $ 530.00/hr | $ 1,457.50 |
| 11/19/2015 | JD | *Legal Work*<br>Review information, conf. w/client, prepare exhibits, finalize and submit prehearing | 5.00 at $ 530.00/hr | $ 2,650.00 |
| 11/20/2015 | JD | *Legal Work*<br>Review agency prehearing, settlement discussions w/AJ, client | 3.00 at $ 530.00/hr | $ 1,590.00 |
| 11/21/2015 | RD | *Legal Work*<br>Emailed agency; Tried to renegotiate settlement terms per client's request | 0.10 at $ 530.00/hr | $ 53.00 |
| 11/23/2015 | RD | *Legal Work*<br>Read and responded to agency email | 0.10 at $ 530.00/hr | $ 53.00 |
| 11/23/2015 | RD | *Legal Work*<br>Read settlement agreement again | 0.15 at $ 530.00/hr | $ 79.50 |

Exhibit J

Rosemary Dettling, Esq.
Federal Employee Legal Services Center
1629 K Street, NW
Suite 300
Washington, DC 20006
Fax 202-379-9772

May 15, 2017

Attn: Kathleen E. Lewis
District of Columbia Bar
Attorney/Client Arbitration Board
1101 K Street, NW, Suite 200
Washington, DC 20005-4210
Via email to acabinfo@dcbar.org

Re:   Hall and Federal Employee Legal Services Center.
      ACAB #2016-17/028, Motion to Dismiss

Dear Ms. Lewis:

I am in receipt of your letter regarding the above-captioned claim. Please accept this letter as my response to Mr. Hall's arbitration request.

I believe Mr. Hall should be collaterally estopped from arbitrating the fee dispute because the fee dispute issue was dismissed "on the merits" by the DC Superior Court. If the ACAB does not to dismiss his request based on the Superior Court's dismissal, the ACAB should stay the arbitration because he also filed suit in federal court, first with the U.S. District Court, District of Columbia, and then on appeal in the United States Court of Appeals for the District of Columbia, asking the Courts to rescind the settlement agreement he signed. The settlement agreement is relevant to his fee dispute because I was paid some attorney fees through the settlement agreement. His appeal to the U.S. Court of Appeals is still pending. If the ACAB does not dismiss his arbitration request on these grounds, I would like to countersue in the amount of $30,268.80.

I.   Facts.

The attachments to this response outline the facts in this case. Mr. Hall retained my services in 2013. I agreed to handle several EEOC complaints he filed against his employer, the Department of Homeland Security (DHS). In addition to his EEOC cases, Mr. Hall had two MSPB cases. One concerned an indefinite suspension. The other concerned a termination. I was retained to represent him on the termination case. He signed two retainer agreements, one in July 2013 and one in December 2013.

In the fall of 2015, we started to prepare for Mr. Hall's MSPB "termination" hearing. I asked my colleague, Joanne Dekker, to help me on the case. She was the main point of contact in the last two months of out representation, but I also helped out. The retainer agreement Mr. Hall signed specifically permitted me to appoint other attorneys to work on his case.

Ms. Dekker worked with Mr. Hall to prepare a prehearing report. The prehearing report was sent to the judge and agency. After the prehearing report was sent to the judge, the judge

2

Exhibit J

contacted me by telephone and told me she was not going to rule in his favor because he did not have any evidence to rebut the agency's reason for the termination. She suggested that we try to settle his case. Under MSPB regulations and case law, MSPB judges have the authority to discuss settlement ex parte with a party, and have the right to discuss the strengths and weaknesses of an appellant's case with his/her counsel, without the other party on the call. In Mr. Hall's case, both parties waived the prohibition against ex parte conversations.

I passed on the judge's message to Mr. Hall and suggested that he focus on settling. Ms. Dekker then discussed settlement with Mr. Hall and worked with the agency to settle the case. The agency offered to pay Mr. Hall 55k and offered to pay me 30k in attorney fees if he dropped all his cases. This was a generous offer considering that Mr. Hall did not have any evidence to show that his termination was unwarranted. None of the witnesses he listed agreed to testify on his behalf.

As seen in the retainer agreements, which Mr. Hall included in his ACAB request, Mr. Hall agreed to ask the agency to pay attorney's fees at the Laffey rate. Because I knew Mr. Hall would not win his case (based on what the judge told me and the fact that he had no helpful witness testimony), and knew we would not get paid for our fees even if we went to a hearing, I wanted to help Mr. Hall out and get him as much money as we could. I agreed to accept only 30k in fees and even agreed to give him his refund of 15k if he accepted the agency's settlement offer. The only reason I made that special deal with him was because we were going to paid the 30k within a few weeks of settlement.

Soon after Mr. Hall learned that the check for 30k in attorney fees was not going to be mailed to him, he said he was terminating service. Prior to terminating service, he directed us to tell the agency that he revoked the agreement. Ms. Dekker and I both told the agency that he revoked the agreement. The settlement agreement allowed him to revoke the agreement within seven days. When we were terminated, there was no final settlement agreement accepted by the judge. The case was still open.

The record shows that after revoking the settlement agreement, Mr. Hall, while representing himself pro se, rescinded the revocation during a conference with the judge and counsel for DHS. Mr. Hall subsequently filed a submission to the MSPB agreeing to proceed with the settlement. On that basis, the judge entered an order approving the settlement agreement. On December 1, 2015, MSPB Judge Hudson issued an "Initial Decision" dismissing Mr. Hall's appeal as voluntarily settled. See Hall v. Department of Homeland Security, MSPB Docket No. DC-0752-14-0243-I-1 (December 01, 2015). At footnote 1 of the Initial Decision, Judge Hudson stated:

> Subsequently, by submission dated November 30, 2015, the appellant requested to revoke the settlement agreement within the seven-day period provided therein. See AF, Tabs 26 and 28. Thereafter, during a telephone conference that I held with the appellant and the agency's representative, Letitia Byers, Esquire, on November 30, 2015, after answering several of the appellant's questions concerning the agreement. by submission filed on that same date, he requested to 'rescind [his] attempt to revoke the settlement agreement.' AF, Tab 29. The appellant stated that, after considering his options, he wished to go forward with the agreement.

On January 2, 2016, Mr. Hall changed his mind again and decided that he did not want to settle his cases. He filed a Petition for Review with the MSPB appealing the dismissal.

On January 16, 2016, I mailed Mr. Hall an invoice for work performed on his EEOC cases.

EX (J)

recalculated at my Laffey rate/prevailing market rate pursuant to the retainer agreements Mr. Hall signed. Mr. Hall included this invoice in his ACAB request. The invoice shows that Mr. Hall still owes me $37,043.00. His payment of $7,000 was deducted from the amount owed.

On January 16, 2016, I also mailed Mr. Hall his "MSPB" invoice. Mr. Hall included this invoice in his ACAB request. Mr. Hall was billed at the Laffey rate for my time, Victoria Williamson's time, and Joanne Dekker's time. He was billed the Laffey rate/prevailing market because he terminated service. The invoice shows that Mr. Hall still owes me $23,225.80. His payment of $8500 was deducted from the amount owed.

After he terminated our service, we recalculated his fees at the Laffey rate, per the signed retainer agreement and sent him these invoices. Although he is objecting to it now, Mr. Hall agreed to be charged at the Laffey rate if he terminated our service. Paragraph 7 of the retainer agreements is not ambiguous. It specifically states:

7.    Withdrawal

Attorneys reserve the right to withdraw representation based upon Client's misleading statements, misrepresentations, vexatious behavior, failure to disclose material facts, or failure to make payments as required by this agreement. If Attorneys withdraw as your counsel and terminate the attorney-client relationship, Attorneys shall be entitled to receive from Client full payment for fees and expenses for legal services at the prevailing market rate.

The Client can terminate the Attorney-Client relationship at any time. If the Client terminates services prematurely before a resolution has been obtained, Client understands that he/she will be billed for all phone calls, emails, motions, hearing preparation, research, at the Attorney's Laffey rate. Client also understands that, if he/she terminates service before Attorney fees are awarded, he/she will be billed for all work done to the date of the termination at the Attorneys' Laffey rate (prevailing market rate), rather than at the reduced rate offered in Section 3A and 3B, above.

When Mr. Hall fired us, he owed us for all work to date at the Laffey rate. We did eventually receive the 30k payment from the agency in July 2016. We applied that payment to Mr. Hall's balance. His outstanding balance is $30,268.80.

On June 23, 2017, the MSPB denied Mr. Hall's Petition for Review. In Hall v. Department of Homeland Security, DC-0752-14-0243-I-1 (June 23, 2016), the MSPB stated:

… We find that, by the terms of the settlement agreement, the appellant knowingly and voluntarily signed the settlement agreement, waived further appeal rights concerning the issues raised in this appeal, and the waiver is enforceable.

… The appellant was not misled. As discussed above, the appellant must have understood that he could revoke the settlement agreement within 7 days because he requested to revoke the agreement. ID at 1 n. 1; IAF, Tab 28. The revocation would have cancelled the settlement agreement. However, aft4er a conference call with the administrative judge and the agency's representative, the appellant rescinded the revocation stating, "I wish to go forward with the agreement after carefully considering my options. IAF, Tab 29. Therefore, the appellant's

revocation is no longer in effect, and the parties are bound by the terms of the settlement agreement.

In July 2016, Mr. Hall brought suit against me, my sole proprietorship business (the Federal Employee Legal Services Center), my contract attorney (Joanne Dekker), and DHS, in the U.S. District Court, District of Columbia. See Exhibit A; see also Hall v. Dep't. of Homeland Security, 2016 WL 7017256 (December 1, 2016). In his federal complaint, he alleged that all the defendants conspired against him and coerced him to sign a settlement agreement. He made that allegation in federal court even though he knew that he willingly finalized the settlement agreement after he terminated our representation.

At some point in July 2016, I offered Mr. Hall $15,500 if he would drop his federal malpractice and breach of contract claims. I did not think he deserved the refund. I thought of it as nuisance payment. I was willing to give him the refund to get rid of the federal case. He did not accept the settlement offer.

On August 25, 2016, Mr. Hall voluntarily dismissed his U.S. District Court complaint.

On November 29, 2016, Mr. Hall filed a DC Bar complaint with the DC Bar's Office of Disciplinary Counsel, alleging that my alleged "professional misconduct ... resulted in my District Court case being dismissed." He made that statement, knowing full well that his District Court case was voluntarily dismissed. He also alleged that the MSPB judge and I engaged in impermissible ex parte conversations during settlement negotiations, even though he was repeatedly told the discussions were permissible. See Forston v. Department of the Navy, 60 M.S.P.R. 154, 160 (1983) ("In settlement negotiations, administrative judges are permitted to inform the parties of the relative strengths and weaknesses of their cases. Such statements do not indicate bias or coercion."). Mr. Hall alleged that he was forced to sign the settlement agreement, however, the facts show that he settled his agreement after he terminated service. I do not know what he settled for after he fired us and do not know which settlement agreement he used. Because he was representing himself pro se when he told the judge he wanted to settle, he is responsible for whatever agreement was entered into the record. When he terminated service, there was no final agreement. In fact, the judge allowed him to revoke the agreement after he fired us. Given this, he cannot blame me for an agreement he signed after he fired us.

On December 30, 2016, Mr. Hall filed suit against me in DC Superior Court. In his DC Superior Court complaint, he again raised the fee dispute and argued that he was entitled to a refund of the $15,500. See Exhibit B – DC Superior Court complaint.

Before my response to the DC Superior Court complaint was due, Mr. Hall filed an appeal with the U.S. Court of Appeals, District of Columbia. See Exhibit C – Appeal to US Court of Appeals, DC. He asked the Court of Appeals to remand the case to the District Court to allow the District Court to decide whether to rescind the settlement agreement he signed, while representing himself pro se.

On February 2, 2017, I filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment in the DC Superior Court case. See Exhibit D - Motion to Dismiss/Motion for Summary Judgment. I again addressed the fee dispute issue and argued that Mr. Hall was not entitled to a refund because he agreed in his signed retainer agreement that my fees would be re-calculated at the Laffey rate if he terminated service. I argued that:

EX (J)

... Both of these contracts establish that [Mr. Hall] agreed, in the event he terminated [Ms. Dettling]'s representation, to pay [Ms. Dettling]'s her full attorney fees at her Laffey matrix rate, otherwise known as her prevailing market rate.

The Complaint also shows that, after [Mr. Hall] terminated her service, [Ms. Dettling] recalculated her fees and sent [Mr. Hall] two invoices. On January 16, 2016, [Ms. Dettling] mailed [Mr. Hall] an invoice for work performed on his EEOC cases, recalculated at [Ms. Dettling]'s Laffey rate/prevailing market rate pursuant to the retainer agreements [Mr. Hall] signed. Id., Ex. A; B; G, pp. 53-65. The invoice showed that [Mr. Hall] owed [Ms. Dettling] $37,043.00. Id., Ex. G, pp. 53-65. His payment of $7,000 was deducted from the amount owed. Id., Ex. G, pp. 53-66. On January 16, 2016, [Ms. Dettling] also mailed [Mr. Hall] his "MSPB" invoice. Id., Ex. G, pp. 67-75. The invoice also reflected [Ms. Dettling]'s "prevailing market rate" because [Mr. Hall] had terminated service. It showed that [Mr. Hall] owed $23,225.80. Id. His payment of $8500 was deducted from the amount owed. Id., Ex. G. p. 74.

As of January 16, 2016, [Mr. Hall] owed [Ms. Dettling] $37,043.00 for work on his EEOC cases, and $23,225.80 on his MSPB case, after deducting payments previously made. The outstanding amount owed was $60,268.80.

The Agency paid [Ms. Dettling] $30,000, which left a balance of $30,268.80.

While [Mr. Hall] is not happy that [Ms. Dettling] exercised her right to bill him at the Laffey rate after he terminated her service, she was entitled to do so under the agreements he signed. [Mr. Hall] has not shown that the retainer agreement, on its face, was a fraudulent agreement. Nor has he shown that requesting "prevailing market rates" and enforcing her agreements is fraudulent. In the District of Columbia, where a party is entitled to reasonable attorney's fees the amount is calculated according to prevailing market rates and not on the basis of actual cost. See, e.g., Blum v. Stenson, 465 U.S. 886, 894-96 (1984); Link v. District of Columbia, 650 A.2d 929, 934 (D.C. 1994); Henderson v. District of Columbia, 493 A.2d 982, 999 (D.C. 1985).

In sum, [Mr. Hall] has not stated a claim for breach of contract because he has not shown that [Ms. Dettling] breached any duty, and not shown that damages resulted from the alleged breach. Tsintolas Realty Co. v. Mendez, 984 A.2d 181, 187 (D.C. 2009) (citation omitted).

On February 9, 2017, the DC Bar's Office of Disciplinary Counsel concluded that I did not engage in any wrongdoing with respect to my billing on Mr. Hall's cases. See Exhibit E – DC Bar's letter.

On March 20, 2017, the DC Superior Court Judge Jennifer Di Toro issued an Order Dismissing the case. See Exhibit F – DC Superior Court Order. Judge Di Toro stated on page 5 of her dismissal order that the "Court will therefore consider [Ms. Dettling]'s Motion to Dismiss on the merits." See Exhibit F – DC Superior Court Order, at 5. The judge held that:

In order to set forth a claim for breach of contract, [Mr. Hall] must allege that there existed: 1) a valid contract between the parties, 2) an obligation or duty arising out of the contract, 3) a breach of that duty, and 4) damages caused by breach. Tsintolas Realty Co. v. Mendez, 984 A.2d 181, 187 (D.C. 2009). [Mr. Hall] principally alleges that [Ms. Dettling] breached their contract by seeking payment at the prevailing market rate after he terminated her

EX J

representation. The signed retainer agreements establish that a valid contract existed between the parties. Compl. Ex. A, B. Included in the retainer agreements is language that [Mr. Hall] agreed, in the event of termination of the representation, to pay [Ms. Dettling] "full attorney's fees at [the] Laffey matrix rate." *Id.* The invoices attached to the Complaint show that pursuant to the agreement, once the representation was terminated, [Ms. Dettling] sent [Mr. Hall] two invoices calculated at the Laffey rate, deducting prior payments of $7,000 from the EEOC cases and $8500 from the MSPB invoice. *Id.*, Ex. A, B, G. [Mr. Hall] has not alleged any facts in support of the claim that [Ms. Dettling] breached any duty, nor alleged that damages resulted from the alleged breach. Therefore, the claim shall be dismissed.

**II.     Mr. Hall is collaterally estopped from raising the fee dispute with the ACAB.**

Because the DC Superior Court judge addressed the fee dispute issue "on the merits" and dismissed it, the ACAB should conclude that Mr. Hall is collaterally estopped from filing a claim in this forum. ACAB Rule 4(b) provides that ACAB will not arbitrate fee disputes that "have previously been determined by a court order, rule or decision."

After the DC Superior Court granted my Motion to Dismiss, Motion for Summary Judgment, the Judge issued an Order allowing Mr. Hall to file a Motion for Reconsideration within ten days. See Exhibit G - Order. He did not file a Motion for Reconsideration. Nor did he file an appeal of the dismissal. See Exhibit H - Docket Sheet.

**III.    If the ACAB does not dismiss the complaint, it should be stayed until his federal appeal is decided.**

If the ACAB does not to dismiss his request based on the Superior Court's dismissal, the ACAB should dismiss his complaint or stay the arbitration until his appeal to the U.S. Court of Appeals is resolved. The appeal is still pending and I am still a party to that appeal.

It is highly unlikely that the Court of Appeals would grant his appeal and remand the case to the District Court. It is even more unlikely that the District Court would rescind his voluntary settlement agreement. However, it is still a possibility. A rescission of the agreement would require me to refund DHS the $30,000 they paid me in July 2016. If that occurred, I would have a cause of action against Mr. Hall for $60,268.80 in unpaid fees. While dismissal based on collateral estoppel is appropriate, Mr. Hall's filing with the Court of Appeals should, at the very least, stay the ACAB proceeding.

**IV.    I deny each allegation and countersue for $30,268.80.**

In his ACAB request, Mr. Hall objected to being charged my Laffey rate. However, his signed retainer agreements show that he agreed to be charged my Laffey rate if he terminated service. I could have charged him my current Laffey rate at the time of billing, per our agreement, but I did not do that.

He also claimed that I did not send him an invoice until January 2016, which is true, but that was because he was a "flat" rate client. He did not become an "hourly" client until he terminated service in December 2015. He could have checked his billing record earlier, at our portal on Bill4time.com, but he chose not to do so.

EX J

Mr. Hall alleged that he was not given any justification for the billing; however, the invoices attached to his ACAB request show that the charges were detailed.

Mr. Hall alleged that I "manipulated" the billing invoices, but he did not provide any proof of that.

He next alleged that the retainer agreements did not mention "Victoria Williamson" or "Joanne Dekker"; however, he agreed in his retainer that I could appoint other attorneys to work on his cases. These attorneys worked on his cases.

Mr. Hall alleged that I sent him a text in July 2016, stating I would send him a check. That text was sent for settlement purposes only. He admitted in his ACAB request that my text was sent in "response" to his federal lawsuit. I agreed to send him $15,500 if he agreed to drop all claims ✳ against me, but he refused to do so. Now, almost a year later, after having to respond to dozens of motions in state and federal court, as well as a DC Bar complaint, I am not willing to pay him anything. I wasted thousands of hours on his federal and state case. I cannot get that time back.

Mr. Hall alleged that he was overcharged, but he did not provide any justification for that statement.

Finally, he alleged that I billed him after he terminated service, but that statement is misleading. I charged him less than an hour for time spent notifying the courts of my withdrawal from his cases.

## V.   Conclusion.

I believe the ACAB should dismiss Mr. Hall's arbitration request under ACAB Rule 4(a) and B. If the ACAB does not dismiss his complaint, I would like to countersue in the amount of $30,268.80. Mr. Hall owes me this money because he terminated service. Under our retainer agreement, a client who terminates service agrees to have the fees recalculated at the Laffey rate. I recalculated his invoice after he terminated service.

Mr. Hall voluntarily settled his cases, while representing himself pro se. Instead of accepting responsibility for his actions, he has abused the judicial process, filed the same suit in three separate forums, and filed a frivolous DC Bar complaint that was dismissed. He not only wasted thousands of hours of my time, but he wasted the Honorable James E. Boasberg's time, the Honorable Jennifer Di Toro's time, the DC Bar's time, and the U.S. Court of Appeals' time.

Based on these reasons, I respectfully request that you dismiss Mr. Hall's ACAB request.

Sincerely,

/s/ *Rosemary Dettling*

8

EX J

Office for Civil Rights and Civil Liberties
U.S. Department of Homeland Security
Washington, DC 20528


Homeland
Security

Date:        January 28, 2013

TO:          Mr. Steven Hall

FROM:        Sylvia Groomes,
             JDG Contract EEO Counselor

SUBJECT:     Notice of Right to File a Discrimination Complaint
             DHS Case No. (HS-HQ-00478-2013)
             Issued by certified mail (USPS #7010-2780-0000-5792-3146)

This is to inform you that because the dispute you brought to the attention of the Department of
Homeland Security – Headquarters Equal Employment Opportunity Office has not been resolved
to your satisfaction, you are entitled to file an individual or class-based discrimination complaint
based on (*race, color, religion, sex, national origin, disability (physical or mental), age (40 and
over), protected genetic information, reprisal/retaliation, parental status, or sexual
orientation*).

You raised the following issues and bases during the pre-complaint counseling:

Was Aggrieved Person (AP) discriminated against and subjected to harassment which constitutes
a hostile work environment on the bases of *Race (Black, Sex (Male), Age 47, (DOB: 7/25/1965),
Physical Disability (Airways Disease) and reprisal (filed 4/23/2012) as it relates to, in part, but
NOT limited to reasonable accommodation and absence without leave consisting of the following
alleged discriminatory incidents:*

　　　1.   Delay and inadequate response to his reasonable accommodation.

　　　2.   Request for reassignment.

　　　3.   Current absence without pay.

If you file a complaint, it must be in writing, signed, and filed within fifteen (15) calendar days
after receipt of this notice, with the following official authorized to receive discrimination
complaints:

　　　Carl Lucas
　　　Director, Headquarters Equal Employment Opportunity
　　　Department of Homeland Security - Office for Civil Rights & Civil Liberties
　　　Mail Stop 0145 - 245 Murray Lane, S.W., Building 410
　　　Washington, DC  20528 or by fax: 202-245-1141

Exhibit (K)

1

The complaint must be specific and contain only those issues either specifically discussed with me or issues that are like or related to the issues that you discussed with me.  It must also state whether you have filed a grievance under a negotiated grievance procedure or an appeal to the Merit Systems Protection Board on the same claims.

If you have any questions, please contact James Cooley, Informal Complaints Manager who can be reached at (202) 245.1133 or james.cooley@dhs.gov.

Enclosure (1):

Department of Homeland Security
Individual Complaint of Employment Discrimination
DHS Form 3090-1 (09/11)

2                                          Ex (K)

## Scores by Demographic ✳
## 40 and over

The demographic categories measure the performance of agencies and agency subcomponents related to employee satisfaction and commitment, according to a given demographic group. Not all agencies have data for demographic groups, due to small sample sizes.

Loading...

| RANK | AGENCY | 2012 ▾ | 2011 | CHANGE |
|------|--------|--------|------|--------|
| 1 | National Aeronautics and Space Administration | 74.9 | 74.6 | 0.30 |
| 2 | Department of State | 72.1 | 73.1 | -1.00 |
| 3 | Department of Justice | 69.4 | 71.2 | -1.80 |
| 4 | Department of the Treasury | 69.2 | 70.8 | -1.60 |
| 5 | Social Security Administration | 68.8 | 72.7 | -3.90 |
| 6 | Environmental Protection Agency | 68.6 | 68.7 | -0.10 |
| 7 | Department of Commerce | 68.3 | 69.7 | -1.40 |
| 8 | Department of the Navy | 67.2 | 68.1 | -0.90 |
| 9 | Department of the Air Force | 65.7 | 66.4 | -0.70 |
| 10 | Department of Health and Human Services | 65.4 | 65.0 | 0.40 |
| 11 | Department of the Army | 65.0 | 67.7 | -2.70 |
| 12 | Department of the Interior | 64.0 | 65.1 | -1.10 |
| 13 | Office of the Secretary of Defense, Joint Staff, Defense Agencies, and Department of Defense Field Activities | 63.9 | 63.8 | 0.10 |
| 14 | Department of Transportation | 63.2 | 59.3 | 3.90 |
| 15 | Department of Veterans Affairs | 62.5 | 66.0 | -3.50 |
| 16 | Department of Labor | 61.4 | 61.5 | -0.10 |
| 17 | Department of Agriculture | 60.2 | 63.5 | -3.30 |
| → 18 | Department of Homeland Security | 55.9 | 59.4 | -3.50 |
| 🚫 | Intelligence Community | 🚫 | 🚫 | 0.00 |

🚫 No Data     ⤴ No Change

© 2012 Partnership for Public Service

"The Best Places to Work in the Federal Government" is a registered trademark of the Partnership for Public Service.

✳ Being that I am over 40, CRSO and HMD CoC has discriminated against me, than, Mr. Haigh has occasions threatened me with AWOL on three separate occasions in hopes of forcing me out of the Federal government.

3

EX (K)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**WASHINGTON FIELD OFFICE**
**131 M Street, N.E., Suite 4NW02F**
**Washington, D.C. 20507**

| | | |
|---|---|---|
| Steven Hall, | ) | |
|    Complainant, | ) | EEOC No. 570-2013-00968X |
| | ) | Agency No. HS-HQ-00478-2013 |
|    v. | ) | |
| | ) | |
| Jeh Johnson, Secretary, | ) | |
| U.S. Department of Homeland Security, | ) | AJ: Kurt Hodges |
|    Agency. | ) | |

## DESIGNATION OF REPRESENTATIVE

### OPTION A: ELECTION TO PROCEED WITH A REPRESENTATIVE

I hereby designate the following individual as the representative in the above-referenced EEOC case:
    __XXX__     COMPLAINANT                  AGENCY

**Name of Representative:** _Rosemary Dettling_

**Representative's Address:** _1629 K Street, NW, Suite 300, Washington DC 20006_

**Representative's Telephone/Fax #.** _(202) 390-4741 / (202) 379-9772_

**Representative's Email Address:** _RDettling@felsc.com_

**If Complainant's representative,**
**Complainant's address:** _7141 Chesapeake Village Blvd, Chesapeake Beach, MD 20732_

**Complainant's Tel./fax:** _Hm (410) 286-7170 Cell (301) 801-6506_

**Complainant's E-mail address:** _Steven.H.Hall@comcast.net_

_[signature]_                        _5/22/2014_
SIGNATURE OF COMPLAINANT           DATE

### OPTION B: ELECTION TO PROCEED WITHOUT A REPRESENTATIVE

I will proceed without a representative in the above-referenced EEOC case.  I understand that I must notify the
Administrative Judge and the agency immediately if I obtain representation at a later date.

**Complainant Name:** _____

**Address:** _____

**Telephone/Fax:** _____

**Email Address:** _____

_____          _____
SIGNATURE OF COMPLAINANT          DATE

4                 Ex (K)

## UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD
## WASHINGTON REGIONAL OFFICE

STEVEN H. HALL,

Appellant,

v.

DEPARTMENT OF HOMELAND
    SECURITY,

Agency.

DOCKET NUMBER
DC-0752-14-0243-I-1

DATE: November 4, 2015

## ORDER AND NOTICE OF HEARING AND PREHEARING CONFERENCE

The hearing in this appeal will be held:

Date:       **December 3, 2015**

Time:       **9:00 a.m.**

Location:   U.S. Merit Systems Protection Board
            1901 South Bell Street, Suite 950
            Arlington, VA  22202-4802

If the appellant fails to appear without good cause, the appeal will be decided without a hearing. If the agency representative fails to appear, the hearing will, absent extraordinary circumstances, proceed as scheduled.

### PREHEARING SUBMISSIONS

I **ORDER** the agency and the appellant to file the following to be received in this office on or before **November 19, 2015:**

(1)   A statement of facts and issues (the appellant must include any and all defenses);

(2)   A list of all agreed upon material facts;

5

Ex (K)

## CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

### Appellant

| | |
|---|---|
| Electronic Mail | Steven H. Hall<br>7141 Chesapeake Village Blvd.<br>Chesapeake Beach, MD 20732 |

### Appellant Representative

| | |
|---|---|
| Electronic Mail | Rosemary  Dettling<br>Federal Employees Legal Services Center<br>1629 K Street, NW<br>Suite 300<br>Washington, DC 20003 |

### Agency Representative

| | |
|---|---|
| Electronic Mail | Ms. Letitia Byers<br>Department of Homeland Security<br>245 Murray Lane, SW<br>Mailstop 0485<br>Washington, D.C, DC 20528 |

November 4, 2015
(Date)

/S/
Kiecia Payne
Paralegal Specialist

6

5 of 5

Ex (K)

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
WASHINGTON REGIONAL OFFICE

STEVEN H. HALL,
      Appellant,

DOCKET NUMBER
DC-0752-14-0243-I-1

v.

ADMINISTRATIVE JUDGE
MICHELLE M. HUDSON

DEPARTMENT OF HOMELAND
     SECURITY,
      Agency.

## SETTLEMENT AGREEMENT

This is a global Settlement Agreement ("Agreement") resolving all claims, issues, and causes of action raised or which could have been raised between Steven H. Hall ("Appellant") and the Department of Homeland Security ("Agency") (collectively, the "Parties"), up to the date of this Agreement, including Appellant's MSPB Appeal Docket Number DC-0752-14-0243-I-1.

1.  In exchange for the promise(s) of the Agency contained in Paragraph 2, below, Appellant agrees to the following:

    a.  Appellant's signature on this Agreement constitutes his immediate withdrawal of the above-referenced appeal with prejudice.  Once effective, this Agreement shall act as Appellant's withdrawal of his appeal to be filed with the MSPB and the above-referenced Administrative Judge.

    b.  Appellant's signature on this Agreement also constitutes his withdrawal of the following:

        MSPB Appeals: to withdraw, release, or waive, with prejudice, any and all MSPB appeals, petition for review, grievances, or other actions initiated or filed against the Department of Homeland Security or its current or past agents or employees, as of the date of the signing of this Agreement, including, but not limited to:

           (1) MSPB No. DC-0752-14-0723-I-1; and
           (2) MSPB No. DC-0752-15-1063-I-1.

1

Exhibit (L)

EEO Complaints: To withdraw, release, or waive, with prejudice, any and all formal and informal EEO claims, complaints, appeals, grievances, or other actions initiated or filed against the Department of Homeland Security or its current or past agents or employees, as of the date of the signing of this Agreement, including, but not limited to:

(1) Agency No. HS-HQ-22253-2012/EEOC No. 570-2013-00245X;
(2) Agency No. HS-HQ-00478-2013/EEOC No. 570-2013-00968X;
(3) Agency No. HS-HQ-00804-2013;
(4) Agency No. HS-HQ-02179-2013/EEOC No. 570-2014-00583X; and
(5) Agency No. HS-HQ-23609-2015.

FTCA Claims: To withdraw, release, or waive, with prejudice, any and all pending Federal Tort Claims Act claims, as well as any and all actionable appeals, grievances, district court actions, or other actions initiated, arising out of and or filed against the Department of Homeland Security or its current or past agents or employees, as of the date of the signing of this Agreement, including, but not limited to:

(1) 186-MGMT-14, Standard Form (SF) 95 dated July 30, 2014; denied on November 24, 2015;
(2) 186-MGMT-14, first request for reconsideration denied on May 28, 2015;
(3) 186-MGMT-14, second request for reconsideration denied on July 2, 2015;
(4) 215-MGMT-15, SF 95 dated November 13, 2014, denied on August 20, 2015;
(5) 216-MGMT-15, SF 95 dated October 28, 2014; denied on August 20, 2015; and
(6) 231-MGMT-15, dated June 25, 2015.

FOIA: To withdraw, release, or waive, with prejudice, any and all claims and litigation arising from Freedom of Information Act claims, appeals, grievances or other actions initiated or filed against Department of Homeland Security or its current or past agents or employees, as of the date of the signing of this Agreement.

c. Appellant's withdrawal of the above matters, as detailed in Paragraph 1.b., above, in no way affects any claims he may have before OWCP, *i.e.*, the Department of Labor.

d. To accept the terms set forth herein in full satisfaction of any and all claims, issues, and causes of action through the date of the execution of this Agreement;

e. By entering into this Agreement and as a condition thereto, Appellant, including Appellant's heirs, executors, representatives, attorneys, successors and assigns, hereby settles, releases, relinquishes, waives, and forever discharges the United States of America, Department of Homeland Security, their agents and employees, from any and all demands, rights, claims, or causes of action for any kind of relief whatsoever, whether before any forum, arbitrator, administrative agency, or court which he has raised, or which he may raise, and which arise out of, or are in any manner connected with, or related to Appellant's appeal and other matters referenced in Paragraph 1.b.,

2

EX (L)

above. Appellant agrees not to institute any lawsuit, complaint, grievance, appeal, or other action against the Agency, or any employee or member of the same, based on any matter which is the subject of the above-referenced Appeal and other matters referenced in Paragraph 1.b., above, or concerning any matter which could have been the subject of the Appeal or other matter referenced in Paragraph 1.b., above, up to and including the date when all parties have executed this Agreement;

    f.   That he enters into this Agreement with the Agency knowingly, voluntarily, and with full knowledge of its terms, and absent any coercion or duress;

    g.   That he fully understands all of the terms and conditions of this Agreement and has been given a reasonable amount of time to consider this Agreement and to thoroughly discuss all aspects of this Agreement with his representative;

    h.   That he is physically and mentally fit so as to comprehend the terms of this Agreement in its entirety; and

    i.   To expressly waive any rights or claims he possesses or may possess to any and all remedies, damages, back pay, attorney's fees or costs, interests, payments or benefits of any kind arising from the above-referenced complaint and the matters that were raised or could have been raised therein.

2.    In exchange for the promises of Appellant contained in Paragraph 1 (above), the Agency, subject to the conditions and limits set forth herein, agrees to:

    a.   Pay Appellant the total sum of $55,000.00.

    b.   Pay Appellant's representative the sum total of $30,000.00 for attorney's fees to be paid directly to Rosemary Dettling, Esq., Federal Employee Legal Services Center, 1629 K Street, NW, Suite 300, Washington, DC 20006. Each party shall otherwise be responsible for its/his own costs and attorney's fees arising from or related to the above-referenced Appeal and other matters referenced in Paragraph 1.b.

The Parties further understand and agree to the following terms:

    a.   That this Agreement does not constitute an express or implied admission by any party of any liability, fault, wrongdoing, or of any violation of law, rule, or regulation, or of any fact or allegation with respect to the matters giving rise to this Agreement and to the above-referenced Appellant.

    b.   That the content of this Agreement is confidential and is not to be disclosed by any person, except as follows: (1) to any governmental agency when such disclosure is required by federal, state, or local law; (2) to any party when such disclosure is required by a subpoena issued by a court of competent jurisdiction or by an administrative body; (3) to any Agency officials who are responsible for carrying out the terms of the Agreement or Agency employees or officials who otherwise have a

EX (L)

need to know; (4) in any future proceedings involving the Parties to this Agreement; (5) to Appellant's family, attorney(s), and/or tax advisor; and (6) in any other disclosure required by applicable law or regulation. This Paragraph does not prohibit Agency employees from providing truthful responses about Appellant to an investigator or fact finder during the course of a background investigation or other investigation or inquiry, and the Agency will not be considered in breach of this Agreement for providing truthful responses in any investigation or inquiry.

c. That this Agreement contains the full and complete agreement between the parties. No promises or representations other than those stated herein have been made by either party.

d. That any amendment, modification, or addition to this Agreement must be made in writing and signed by both Parties. The waiver by one party of any breach of this Agreement shall not be deemed a waiver of any other prior or subsequent breach of this Agreement. Neither the Agency nor the Appellant shall be considered to have drafted this agreement for purposes of construing ambiguities against the drafter.

e. That this Agreement is for their mutual benefit and will not establish any precedent, nor will this Agreement be used as a basis for Appellant or any other person(s) or group(s) to seek or justify similar terms in any other case.

f. That any monetary payments of any kind are made to Appellant under the terms of this Agreement, the Agency makes no representation as to the tax consequences or liability arising from said payments. The Parties understand and agree that any tax consequences and/or liability from the payments to Appellant shall be the sole responsibility of Appellant.

g. No other promises or agreements shall be binding on the Parties unless mutually agreed to in writing and made a part of this Agreement by amendment.

h. That there is sufficient consideration supporting this Agreement.

i. That this Agreement shall be binding upon Appellant, his heirs, administrators, representatives, successors and assigns. The Agreement is also binding on the Agency and its successors.

j. That all matters discussed during mediation are confidential, subject to limited exceptions pursuant to the Administrative Dispute Resolution Act of 1996, 5 U.S.C. § 574, as amended.

4. The Parties agree that this Agreement will be filed with the MSPB, which will retain jurisdiction of the matter only for the purpose of enforcing the terms of this Agreement.

5. The Parties agree that this Agreement may be executed in counterparts. Signatures received via facsimile or email PDF shall constitute originals for purposes of the Agreement.

EX (L)

    j. That all matters discussed during mediation are confidential, subject to limited exceptions pursuant to the Administrative Dispute Resolution Act of 1996, 5 U.S.C. § 574, as amended.

4. The Parties agree that this Agreement will be filed with the MSPB, which will retain jurisdiction of the matter only for the purpose of enforcing the terms of this Agreement.

5. The Parties agree that this Agreement may be executed in counterparts. Signatures received via facsimile or email PDF shall constitute originals for purposes of the Agreement.

6. This Agreement shall become effective as of the last date on which the Parties or Parties' representatives sign below.


_____  
Appellant

___11/23/2015___  
Date


_____  
Appellant's Representative

_____  
Date


_____  
Agency Management Official  
*(Title, Division/Unit)*

_____  
Date


EX (L)

Steven Hall <steven.h.hall@comcast.net>                                            12/2/2017 9:07 AM

# Superior Court - Arbitration Lawsuit - ACAB #2016-17/028

To Steven Harold Hall <steven.h.hall@comcast.net>


Superior Court Judge,


On November 2, 2017, Defendants chose not to negotiate or settle fee disputes. In Defendant Dettling latest email, she stated; "I was not going to pursue a lawsuit against you." Plaintiff and his former attorney attempted to negotiate and mediate with Defendant, but she ignored all requests.  Defendant's latest email is retaliatory and threatening and filled with slander and defamation of character regarding the Plaintiff. Defendant's negative prejudice exemplifies her hostile attitude toward the Plaintiff.  Defendant fails to understand that the Plaintiff has the right to file valid complaints and lawsuits regarding discrimination; retaliation and other wrongdoings committed against him. It's not about the money, but Plaintiff's right for justice as a retired Veterans Affairs, Service-connected Disabled Veteran with a 90 percent disability rating.


Steven H. Hall

--------- Original Message ---------
From: rosemary dettling <rdettling1@hotmail.com>
To: Steven Hall <steven.h.hall@comcast.net>
Cc: Rosemary Dettling <rdettling@felsc.com>
Date: December 1, 2017 at 7:16 PM
Subject: Re: Superior Court - Arbitration Lawsuit - ACAB #2016-17/028

I wasn't going to pursue a lawsuit against you to get the $30,000 I am entitled to, but now I will. You just won't stop antagonizing me. The DC Bar told you that you had no right to appeal the ACAB decision, but you do not listen. Whoever is giving you advice has done you a great disservice. You have lost every suit you filed. You failed to appeal on time. You didn't take the refund when it was offered. Now you are going to have a lien against your house and a garnishment order against any future earnings you make. Good job ruining your life and reputation. You are a classic narcissist — blaming everyone else for your problems. Instead of getting a job, you just sue people to get money. I've seen all your lawsuits. It's just pathetic.

Rosemary Dettling
Tel. 202-390-4741
Fax 202-379-9772

On Dec 1, 2017, at 6:36 PM, Steven Hall <steven.h.hall@comcast.net> wrote:


Rosemary,


I am providing you a copy of the subject line lawsuit against you and FELSC.  Have a great weekend.


Steven Hall

United States Navy Chief Petty Officer (Retired)

Veterans Affairs,

Service-connected Disabled Veteran                            Exhibit (M.)

V.    FACTS

1. From August 1, 2012 to August 27, 2012, Plaintiff's respiratory issues; rhinitis and bronchialspasms were exacerbated while assigned for work at DHS St. Elizabeth's (St. E's) construction site.

2. From August 1, 2012 to February 18, 2013, (Roy Neigh) was Plaintiff's First Line Supervisor.

3. On August 2, 2012, Plaintiff started feeling ill at St. E's due to noxious (dusty) working environment.

4. On August 28, 2012, Plaintiff departed St. E's due to dusty working environment that exacerbated his respiratory issues.

5. On September 12, 2012, the Agency (DHS) received a request for reasonable accommodation from Plaintiff Hall and was assigned DHS case number HQ-12-RA--0031.

6. Due to impairment that substantially limited Plaintiff's major life activities (respiratory; breathing issues) he requested work from an alternative location other than St. El's located at 2710 Martin Luther King, Jr. Avenue, S.E., Washington, D.C.

7. DHS occupied three trailer; HMD 1, HMD2, and Security at St. E's where Plaintiff reported for work.

8. From September 28, 2012 to October 1, 2012, General Services Administration (GSA) conducted a scheduled direct air quality tests (AQT) for (comfort; heat, cold, moistness, mold, fungal, and bacteria). GSA did not conduct indirect AQT for (health; respiratory and reactive airway disease) at St. E's.

9. Plaintiff was assigned to work indoors of HMD 2 trailer for his duties and responsibilities. Plaintiff often visited HMD 1 and Security trailers and provided escorts indoors of Bldg. 37 at St. E's. Plaintiff washed and rinsed golf carts outdoors near HMD 1 and HMD2.

10. GSA did not conduct the AQT's for Plaintiff's health concerns for which Plaintiff's workers' compensation benefits should not have been rescinded by OWCP on June 10, 2013.

11. DHS Industrial Hygienist (Camille Carraway) informed (Mills) via email that a variety of samples were used to assess air quality and identify substances that could produce allergic reactions to include Respirable Dust in air and Analysis of Settled Dust.

12. DHS Management did not inform GSA that Plaintiff respiratory issues were exacerbated due to a noxious (dusty) working environment at St. E's construction site.

13. On October 15, 2012, DHS Disability Program Manager (DPM) determined that Plaintiff was "individual with a disability" entitled to reasonable accommodation under the Rehabilitation Act of 1973.

Exhibit (N)

14. Defendant Agency was aware that rescinding Plaintiff's benefits violated Section 5, 8151, Part 353, Rehabilitation Act of 1973, and Federal Employees Compensation Act (FECA) guidelines; Chapters 6-4 (medical treatment and evaluations), 8-2 (Retention Rights), 8-3 (Nurse Services), 8-4 (Reemployment with the Agency - Elements of Job Offer), and  8-5 (Vocational Rehabilitation Services).

15. DHS Management directed Plaintiff's former supervisor (Neigh) to take steps and comply with the Rehabilitation Act of 1973 to include continued engagement in the reasonable accommodation interactive process for which would reassign Plaintiff in a new job at a different location.

16. On or about November 19, 2012, Plaintiff submitted a claim for workers' compensation benefits and the Agency retaliated and started charging Plaintiff AWOL on November 21, 2012.

17. On November 21, 2012, Defendant Agency (Neigh) provided Plaintiff a copy of the AQSR via FedExpress mail and used the AQT/AQSR as an excuse to charge Plaintiff wrongful AWOL.

18. On August 20, 2015. DHS FOIA investigation revealed that (Mills) stated, *The report we received only addressed indoor air quality. We did not have nor did we provide any outdoor air test to Steven*"

19. On January 9, 2013, the Office of Workers Compensation Programs (OWCP) granted Plaintiff compensation benefits regarding his occupational diseases (rhinitis and bronchialspasms).

20. On January 22, 2013, (Neigh) issued Plaintiff an "Notice of AWOL Status" letter.

21. From February 19, 2013 to November 18, 2013, (Chris Mills) was Plaintiff's First Line Supervisor.

22. On February 19, 2013, Plaintiff return to St. E's until his respiratory issues forced him to depart St. E's for a final time on February 26, 2013.

23. From February 26, 2013 to April 19, 2013, the Agency DPM delayed Plaintiff's request for reasonable accommodation and Plaintiff was charged 291 hours AWOL while in LWOP/OWCP Injury status.

24. (Neigh and Mills) often mishandled Plaintiff's workers' compensation to prevent future benefits. On February 28, 2013, (Sharon Lewis) stated, *"..I do not want this form to get mishandled like the last one."*

25. On March 4, 2013, Plaintiff emailed (Mills) and Workers' Compensation representative (Sharon Lewis) email proposals to remove him from St. E's, a noxious (dusty) working environment.

26. Plaintiff was paid workers compensation benefits for period September 21, 2012 to March 29, 2013 and this nullified charged AWOL during this time period.

27. On or about April 1, 2013, the Office of Workers Compensation Programs (OWCP) mailed Plaintiff a benefits check for $24,281.12.

EX (N)

28. On or about April 5, 2013, OWCP mailed Plaintiff a benefits check for $5,269.80.

29. On April 10, 2013, Plaintiff stated; "*As you are aware that I mentioned in block #13 my reasons for submitting my request for workers compensation - Mental Stress. I do not want this sensitive information provided to anyone else within DHS MGMT because this would be embarrassing to say the least, this information is for you and Ms. Lewis eyes only.*" Also, Plaintiff informed (Mills) via phone conversation that his medical triage notes were misinterpreted and submitted his CA-2 claim for Traumatic Injury/Mental Stress.

30. (Myers/Mills) did not submit Plaintiff's CA-2 claim for Mental Stress to OWCP, instead provided the sensitive medical triage notes and information to OCSO PSD on or about April 19, 2013.

31. On April 22, 2013, (Mills) failed or refused to inform Agency Office of General Counsel (OGC) that Plaintiff did not directly threatened himself, nor DHS employees. From April 22, 2013 to April 26, 2013, (Mills) documented on Plaintiff's timesheet LWOP/OWCP Injury status.

32. On April 26, 2013, (Mills) did not submit Plaintiff's CA-7 claim for reactive airway disease for period April 1, 2013 to April 26, 2013 to OWCP for processing. (Mills) charged Plaintiff AWOL instead.

33. On April 26, 2013, OCSO PSD suspended Plaintiff's access to classified information due to an allegation of a direct threat made by (Mills) regarding himself and other DHS employees.

34. Plaintiff was in a LWOP/OWCP Injury status from September 21, 2012 to June 10, 2013 for which the Agency should not have charged Plaintiff AWOL.

35. From April 28, 2013 to May 27, 2013, the Agency put Plaintiff on administrative leave w/pay regarding an alleged complaint of a direct threat.

36. Between May 1, 2013 to May 7, 2013, DHS Workers' Compensation Advisor, (Gary Myers) provided OWCP an Air Quality Sample Report (AQSR) from September 28, 2012 to October 1, 2012.

37. On or about May 8, 2013, (Myers) participated in a secret meeting with OWCP to deny Plaintiff workers' compensation benefits to justify charging Plaintiff AWOL from April 1, 2013 to April 19, 2013.

38. On May 13, 2013, the Agency DPM indicated that Plaintiff was a "*qualified individual with a disability*" regarding reasonable accommodation and recommended a new job position away from St. E's construction site.

39. From May 13, 2013 to November 18, 2013, the Agency refuse to issue Plaintiff an Eligibility Job Offer (EJO) letter to allow Plaintiff a return to work in a new job location.

40. On May 28, 2013, the Agency indefinitely suspended Plaintiff from Federal service.

EX(N)

41. From May 28, 2013 to November 17, 2013, the Agency never provided Plaintiff reasonable accommodation regarding his exacerbated respiratory issues at St. E's construction site.

42. On June 10, 2013, OWCP rescinded Plaintiff's workers' compensation benefits due to a biased, untimely, and insufficient AQT/AQSR that was more than 200 days old.

43. On January 28, 2014, Like the Plaintiff, (Myers) often did not agree with OWCP internal procedures. Myers stated, *"Based on our mutual agreement that a DOL-OWCP internal procedure was not followed properly and that is what prompted and internal DOL-OWCP re-evaluation.."*

44. In June 2015, DHS OGC attorney (Byers-Yates) inquired about handling Plaintiff's workers' compensation claims.

45. In June 2015, (Byers-Yates) was aware that (Neigh and Mills) wrongfully charged Plaintiff 811 hours AWOL from November 21, 2012 to April 19, 2013 while Plaintiff was in a LWOP/OWCP Injury status.

46. On August 30, 2013, the Agency Office of Chief Security Officer (OCSO), Personnel Security Division (PSD) internal investigation reinstated Plaintiff's access to classified information.

47. OCSO PSD internal investigation revealed that (Mills) made false statements for which nullified allegation of a direct threat and indefinite suspension.

48. From August 30, 2013 to September 12, 2013, (Mills) extended indefinite suspension and this prevented Plaintiff from returning to work.

49. On September 10, 2013, OCSO PSD inform Plaintiff that he was reinstated effectively. From September 13, 2013 to September 30, 2013, (Mills) retaliated by charging Plaintiff AWOL.

50. From October 1, 2013 to October 16, 2013, the Federal government was shutdown.

51. From November 21, 2012 to October 17, 2013, (Neigh/Mills) charged Plaintiff 896.5 hours of AWOL.

52. From October 17, 2013 to November 17, 2013, (Mills) put Plaintiff on administrative leave w/pay and issued Plaintiff "Notice of Proposal for Removal" from his job position on October 18, 2013.

53. (Mills) did not acknowledge Plaintiff's requests for reasonable accommodation, workers' compensation claims and benefits, and Title V, Section 8151, Part 353, and Federal Employees Compensation Act (FECA), Chapter 8 guidelines to include retention and Rehabilitation Act of 1973.

54. (Mills) and DHS Front Office Executive were aware that several job positions were vacant throughout the Agency that Plaintiff was qualified to fill.

Ex(N)

55. (Mills) put Plaintiff on administrative leave w/pay, charged him AWOL, placed Plaintiff on indefinite suspension and extended the suspension, issued a Notice of Proposal for Removal, and worked with DHS Employees Relations to remove Plaintiff from Federal service on November 18, 2013.

56. The Agency provided Plaintiff an inaccurate SF-50 (Personnel Action) for removal from Federal service knowingly that Plaintiff was never issued a Eligibility Job Offer and was not released by Veterans Affairs and family doctors for a return to his job position at St. E's.

57. The Agency (Neigh and Mills) charged Plaintiff 896.5 hours AWOL for which 213.5 hours (27 days) non- consecutive days was AWOL charged by default. The remaining 683 hours AWOL from November 21, 2012 to March 29, 2013 should have been charged as LWOP/OWCP Injury status.

58. The Agency and (Byers-Yates) was aware that Plaintiff was more than 40 years old.

59. Plaintiff informed Agency regarding age discrimination under EEO Case HS-HQ-00478-2013 and EEOC Case No. 570-2013-00968X and did not inform MSPB Administrative Judge (AJ).

60. On November 18, 2013, the Agency terminated Plaintiff from Federal service.  This was labor, employment, and disability discrimination against Plaintiff.

61. On July 9, 2013, Plaintiff hired Dettling as his representative for EEOC/MSPB related matters.

62. On or about July 17, 2013, December 4, 2013, and March 14, 2014, Plaintiff paid Dettling $15,500 in legal fees.

63. The EEOC and MSPB related representation agreement between Dettling and Plaintiff provided, "After these fees are paid, "Client will not be charged additionally [sic] legal fees."

64. Although Dettling EEOC representation began on July 9, 2013, her invoices for Plaintiff EEOC related work was dated January 1, 2016.

65. Although Dettling MSPB representation began on December 3, 2013, her invoices for Plaintiff MSPB related work was dated January 1, 2016.

66. Plaintiff received billing statements/invoices more than three years after he retained Dettling.

67. Reports of Investigation (ROI's) issued after the investigation of Plaintiff's formal EEOC complaints on October 21, 2013, February 2, 2014, April 14, 2014, and August 19, 2014.  Dettling billings/statements does not mentioned any attempt to settle Plaintiff's case in the period after the issuance of each ROI's.

Ex (N)

68. On November 3, 2015 at 7:22pm, Dettling text Plaintiff; "*I take [sic] to the Judge today. She called me and I called her back. She wanted to talk about settlement.*" The Agency was not included in the calls. At 7:22pm, Dettling text Plaintiff regarding MSPB AJ Michelle Hudson, "*she didn't think you would win your case..She insisted that was a good settlement and she did not think she would find in your favor.*" MSPB AJ Hudson denied communicating with Dettling on November 3, 2015. Plaintiff's MSPB invoices contain no entries, no phone call discussions, or settlement related or other communication on November 3, 2015.

69. On or about November 12, 2015, MSPB AJ Hudson communicated ex parte with Agency OGC attorney (Byers-Yates) and suggested that (Byers-Yates) contact Dettling. Byers-Yates contacted Dettling, but redirected to Joanne Dekker (co-attorney) who was not familiar with Plaintiff's case.

70. From November 12, 2015 to November 22, 2015, Dettling remove herself from Plaintiff's case allowing (Dekker) to take over case. Dettling continued to help by directing Dekker on what to tell Plaintiff.

71. Dettling was aware that Plaintiff still wanted his GS-12 job position, back pay, and attorney fees.

72. Dettling MSPB billing/statements contained no entries for November 12, 2015 and the Agency and Dettling did not attempt settlement before November 12, 2015.

73. On November 20, 2015, Dettling billing/statement first mentions settlement.

74. On November 21, 2015 at 9:39am, Dettling emailed Byers-Yates and Cc Dekker and Plaintiff was not included in the email regarding the Settlement Breach Term Agreement (SBTA). Dettling and Byers-Yates did not inform MSPB AJ about SBTA. At 11:48am, Dettling text Plaintiff, "*The judge will probably be very annoyed that you said you were going to settlement and back out. I've see people do this and they end up with nothing.*" (Note to Judge: This was coercion by Dettling). At 12:04pm, Plaintiff responded, "*I understand the judge wants to rush it, however I want the most cash and the termination dropped.*" At 12:16pm, Dettling responded, "*The cash part is not going to increase.*" At 12:23pm, Plaintiff responded, "*From October 2012 to October 2015, "I lost $240K in salaries.*"

75. On or about November 23, 2015 at 10:26am, Dekker text Plaintiff, "*The Agency is angry, ~~bill~~ is but still willing to pay $30K for attorney fees and give you a clean record.*" (Note to Judge: a clean record means nothing because Plaintiff is not being returned to his GS-12 job position). At 11am, Dettling text Plaintiff, "*They [Agency] will give you the clean record or the 55 [thousand dollars] but not both.*" At 11:08am, Dettling text Plaintiff, "*Do you want to accept the 85 [thousand dollars] and move on. They are not willing to take [off] the termination.*" (Note to Judge: Dettling and Dekker lack of legal support indicated that there was no plan or negotiation with Agency for Plaintiff to return to his GS-12 job position.)

76. On November 23, 2015 at 1:43pm, Dekker emailed the settlement agreement to Plaintiff a first time and it did not include the OWBA/ADEA under paragraph 1.g. Between 1:44pm and 2:11pm, Plaintiff signed settlement agreement and was not aware of OWBPA/ADEA. (Note to Judge: Plaintiff shredded the first agreement with errors at work and Dettling has a copy of the first faxed agreement). At 2:12pm, Byers-Yates stated, "*I forgot to add the language from the ADEA.*" At 2:15pm, Dekker emailed Plaintiff settlement

EX (N)

agreement a second time and it did not include the OWBA/ADEA under paragraph 1.g. Between 2:16pm and 2:33pm, Plaintiff signed settlement agreement a second and last time and it did not include the OWBA/ADEA under paragraph 1.g. At 2:34pm, Dekker stated via email, "*the ones [settlement agreements] you signed and forwarded do not contain ADEA language*." The Plaintiff did NOT sign the settlement agreement a third time. At 2:35pm, Dekker signed the fraudulent settlement agreement and emailed or faxed to Byers-Yates. At 2:39pm, Byers-Yates signed and emailed or faxed settlement agreement back to Dekker. Between 2:40pm and 4:45pm, Dekker and Byers-Yates made several administrative adjustments to the settlement agreement, an attempt to hide duplicated paragraphs j, 4, and 5 on pages 4 and 5 of the settlement agreement. The OWBPA clause provided that Plaintiff, "may revoke this Agreement at any time within seven (7) days after signing it."

77. On November 23, 2015, the working relationship between Plaintiff, Dettling, and Dekker had ended based on the fact that the settlement agreement was signed in bad faith.

78. Dettling and Byers-Yates knew Plaintiff was not aware of the Older Workers' Benefits Protection Act (OWBPA) and ADEA before he signed the settlement agreement.

79. Dettling was aware that Plaintiff had raised age discrimination complaints under Agency EEO Case No.HS-HQ-00478-2013 and EEOC Case No. 570-2013-00968X being that she was the Designated Representative. Dettling did not inform MSPB AJ that Plaintiff raised age discrimination.

80. Agency OGC attorney (Byers-Yates), Dettling, and Joanne Dekker (co-attorney) was aware that Plaintiff signed a fraudulent settlement agreement that did not include Older Workers' Benefits Protection Act (OWBPA) and Age Discrimination and Employment Act (ADEA) under paragraph 1g.

81. The fraudulent settlement agreement dismissed two MSPB and six EEOC case complaints of discrimination against the Agency and guaranteed Dettling, Dekker, and FELSC an award fee of $30K.

82. Byers-Yates and Dekker knowingly provided MSPB AJ Hudson a fraudulent settlement agreement to prevent Plaintiff from being reinstatement in his former GS-12 job position and collecting compensatory and punitive damages, and guaranteed Dettling and Dekker an award fee of $30K.

83. On November 24, 2015 at 10:24am, Agency OGC attorney (Byers), states via email to Dettling, "*The OWCP clause applies to waiver of any age discrimination claims*." Same day Dettling stated, you [Plaintiff] are not permitted to revoke the agreement."

84. On November 28, 2015 at 4:39pm, Plaintiff emailed Dettling and Dekker stating, "*I have decided to move in a different direction based on the fact that I was being ill-advised, misrepresented, and that the MSPB judge witness incompetence during the prehearing conference. Immediately your assistance is no longer required and I am terminating our working relationship.*" Plaintiff did not prematurely terminate Dettling and Dekker, Agency issued a check for $30K to FELSC, thus eliminating a premature termination.

EX (N)

85. The retainer agreements Plaintiff signed provides in relevant part; "*The Client can terminate the Attorney, Client relationship at any time. If the Client terminates services prematurely before a resolution has been obtained, Client understands that he/she will be billed for all phone calls, emails, motions, hearing preparation, research, at the Attorney's Laffey rate.*" A resolution was already obtained on November 23, 2015.

86. Dettling retainer agreements required Plaintiff to pay $3,500 deposit at $300 per hour for July 2013 (EEOC), December 2013 (MSPB) was a flat-rate of $8,500, and March 2014 (EEOC) was a $3,500 deposit at $350 per hour. The total retainer agreements were $15,500. Dettling raised her Laffey rate to $530 per hour knowingly she was not prematurely terminated regarding two MSPB and five EEOC case complaints.

87. Dettling and Dekker charged Plaintiff more $12K for a Hearing Report and refused to attend a MSPB hearing on December 3, 2015.

88. Dettling attempted to cheat former client (Anthony Caros) out of $138,380,03 in legal fees. MSPB Judge awarded Dettling $67,765.88. The Judge did so after finding that $250, rather than $510, was the reasonable billing rate. See *Anthony Caros v. DHS*, MSPB Docket No. PH-0752-12-0402-A-2 dated February 23, 2015. Mr. Caros was employed, Plaintiff was unemployed and Dettling took advantage of him.

89. On November 30, 2015 at 2:18am, Dettling issued MSPB "Notice of Withdrawal of Representation." Later that morning around 11:45am, Plaintiff wanted to revoke the fraudulent settlement agreement. The Agency OGC attorney (Byers-Yates) threatened Plaintiff that she would file a motion to dismiss his revocation of settlement agreement. MSPB AJ Hudson agreed and stated that she would deny the revocation of settlement agreement. (Note to Judge: This was coercion by Agency and MSPB AJ). Plaintiff stated in letter to MSPB AJ, "*I am requesting to rescind my attempt to revoke the settlement agreement.*" Plaintiff did not realize he had already raised age discrimination in EEO Case No. HS-HQ-00478-2013. (Reasonable Accommodation).

90. Dettling continued to bill Plaintiff on November 30, 2015 for $111, on December 1, 2015 for $68.90, and on December 28, 2015 for $90.10.

91. DHS paid Plaintiff $55K and Dettling $30K under the fraudulent settlement agreement. Dettling sued Plaintiff through ACAB 2016-17/028 Arbitration Hearing for the remaining balance of $30,268.80. The total net amount Dettling would receive under the settlement is $75,768.80.

92. Dettling never introduced Plaintiff to Hagerty before November 2, 2017. Dettling and Hagerty did not email, nor mail Bill4time instructions and password for billings statements to Plaintiff. There is no evidence to show that Dettling and Hagerty attempted to bill Plaintiff from July 9, 2013 to August 12, 2016.

93. On July 23, 2016, Dettling stated via text message, "*I am trying to send you your check [$15,500] but I want to verify some payments.*" On August 16, 2016, Dettling stated via email, "*I will reimburse you the fees you paid me ($15,500) if you agree to voluntarily dismiss the federal case [16-1471] against me.*" On May 15, 2017, Dettling indicated via ACAB 2016-17/028 letter, "*I agreed to accept only 30K in fees and even agreed to give him his refund of 15K if he accepted the agency's settlement offer.*"

Ex(N)

94. Dettling hired Barbara Hagerty, Billings Director to lie and testify against Plaintiff in ACAB 2016-17/028 Arbitration Hearing on November 2, 2017.  Plaintiff was denied a refund of $15,500.

95. Dettling falsely stated that Plaintiff voluntarily dismiss District Court case *Steven H. Hall v. Dept of Homeland Security*, et al., Civil Action No. 16-1471-JEB, 2016, ECF No. 9.

96. Dettling negligent lack of support cause Wes Schooley and wife to lose $50K in wages and medical fees.  See DC Bar Docket No. 2016-D130 and District Court case 16-1471-JEB, ECF 18, pp31-36.

97. Plaintiff provided Dettling workers' compensation information nullifying unwarranted termination on July 23, 2015 and July 24, 2015 via facsimile. Dettling refuse to provide MSPB AJ all pertinent information that would have helped Plaintiff get reinstated into his former GS-12 job position.

98. Dettling manipulated Arbitration Hearing Panel members decision to award Dettling an award fee of $30,268.80. The award fee forced Plaintiff to file for Bankruptcy in December 2017. Dettling have not attempted to sue Plaintiff for the fraudulent award fees of $30,268.80.

99. Dettling and Dekker abandoned Plaintiff's MSPB cases; Docket No. DC-0752-15-1063-I-1, Docket No. DC-0752-14-0243-I-1, EEOC cases; HS-HQ-22253-2012, HS-HQ-00478-2013, HS-HQ- 25656-2016, and HS-HQ-02179-2013.

100. Dettling and Byers-Yates have permanently ruined Plaintiff's career and employment opportunities in the Federal government since November 23, 2015.

**Exhibit (N)**

## VI.   COMPLAINT ALLEGATIONS

### COUNT I

Defendant Agency continuously failed or refused to engage with Plaintiff regarding a fraudulent settlement agreement since November 23, 2015, nor engage with Plaintiff regarding raised age discrimination complaints.

### COUNT II

Defendant Agency continuously failed or refused to engage with Plaintiff regarding OCSO PSD internal investigation that reinstated Plaintiff's access to classified information since August 30, 2013, nor engage with Plaintiff to reassign him into new job position free from dust.

### COUNT III

Defendant Agency continuously failed or refused to engage with Plaintiff regarding LWOP/OWCP Injury status from September 21, 2012 to June 10, 2013, nor engage with Plaintiff regarding wrongful charges of 896.5 hours AWOL from September 21, 2012 to September 30, 2013.

### COUNT IV

Defendant Agency continuously failed or refused to engage with Plaintiff regarding a false allegation of a direct threat since April 26, 2013, nor engage with Plaintiff to discuss altercations or false direct threats.

### COUNT V

Defendant Agency continuously failed or refused to continue and engage with Plaintiff regarding his CA-2 Claim (Notice of Occupational Disease and Claim for Compensation) requests for Traumatic Injury Mental Stress since April 10, 2013, nor engage with Plaintiff regarding reassignment to a new job position.

### COUNT VI

Defendant Agency continuously failed or refused to engage with Plaintiff regarding his CA-2 Claim (Notice of Occupational Disease and Claim for Compensation) for respiratory issues since April 26, 2013, nor engage with Plaintiff regarding reassignment to a new job location.

### COUNT VII

Defendant Agency continuously failed or refused to continue and engage with Plaintiff regarding his CA-2 Claim (Notice of Occupational Disease and Claim for Compensation) requests for retaliation and emotional distress since April 10, 2013, nor engage with Plaintiff regarding reassignment to a new job location.

Exhibit (O)

## COUNT VIII

Defendant Agency continuously failed or refused to engage with Plaintiff regarding a CA-16 Claim (Authorization for Examination/Medical Treatment) and visit from medical specialist since April 1, 2013.

## COUNT IX

Defendant Agency continuously failed or refused to continue and engage with Plaintiff regarding his CA-20 Claim (Attending Physician's Report) requests for approved visits to a physician since April 1, 2013.

## COUNT X

Defendant Agency continuously failed or refused to continue and engage with Plaintiff regarding his requests for reasonable accommodation from May 13, 2013 to November 18, 2013, nor engage with Plaintiff regarding reassignment to a new job position.

## COUNT XI

Defendant Agency continuously failed or refused to engage with Plaintiff regarding unwarranted termination from Federal service since November 18, 2013, nor engage with Plaintiff to eliminate terminating or reassigning him into new job position.

## COUNT XII

Defendant Agency continuously failed or refused to engage with Plaintiff regarding disability discrimination since April 1, 2013, nor engage with Plaintiff to reassign him into new job position.

## COUNT XIII

Defendant Agency continuously failed or refused to engage with Plaintiff regarding employment discrimination since April 26, 2013, nor engage with Plaintiff to reassign him into new job position.

## COUNT XIV

Defendant Agency continuously failed or refused to engage with Plaintiff regarding the Settlement Breach Term Agreement (SBTA) since November 21, 2015, nor engage with Plaintiff to discuss the SBTA.

## COUNT XV

Defendant Agency and FELSC attorneys continuously failed or refused to engage with Plaintiff regarding the settlement agreement since November 23, 2015, nor engage with Plaintiff and notified him about Older Workers' Benefits Protection Act (OWBPA) and Age Discrimination and Employment Act (ADEA).

2                                    Ex (O)

## COUNT XVI

Defendant Agency and FELSC attorneys consistently engaged collusion since November 21, 2015, nor informed MSPB AJ about ex parte communication against Plaintiff to deny two MSPB and six EEOC cases.

## COUNT XVII

Defendant Agency and FELSC attorneys consistently engaged misrepresentation since November 21, 2015, nor informed MSPB AJ about unethical conduct and discriminatory actions against Plaintiff.

## COUNT XVIII

Defendant Agency continuously failed or refused to engage with Plaintiff regarding a biased, untimely, and insufficient AQT/AQSR since September 28, 2012, nor engage with Plaintiff to inform him that the 200-day old AQT/AQSR would be provided to OWCP for review.

## COUNT XIX

Defendant Agency continuously failed or refused to engage with Plaintiff regarding OCSO PSD internal investigation that reinstated Plaintiff's access to classified information since August 30, 2013, nor engage with Plaintiff to reassign him into new job position free from dust.

## COUNT XX

Defendant Agency continuously failed or refused to engage with Plaintiff regarding OCSO PSD internal investigation that reinstated Plaintiff's access to classified information since August 30, 2013, nor engage with Plaintiff to reassign him into new job position free from dust.

## COUNT XXI

The revised settlement agreement Plaintiff signed on November 23, 2015, is unconscionable and was signed under duress and coercion.

## COUNT XXII

The Agency retaliated against Plaintiff based on his statutorily protected by indefinitely suspending Plaintiff from May 28, 2013 to September 12, 2013.

## COUNT XXIII

The Agency retaliated against Plaintiff based on his protected activity by refusing or failing to file an answer to Plaintiff's complaint in *Steven H. Hall v. Department of Homeland Security*, et al.

3                                               Ex (O)

## COUNT XXIV

The Agency retaliated against Plaintiff based on his protected activity by refusing or failing to admit subject matter jurisdiction in *Steven H. Hall v. Department of Homeland Security*, et. al.

## COUNT XXV

The Agency retaliated against Plaintiff based on his protected activity by preventing Plaintiff from gaining discovery and a trial on the merits in *Steven H. Hall v. Department of Homeland Security*, et. al.

## COUNT XXVI

The Agency retaliated against Plaintiff based on his protected activity by preventing Plaintiff from gaining revocation of the revised settlement agreement in *Steven H. Hall v. Department of Homeland Security*.

**Exhibit (*O* )**

## VII.   REMEDIES

A. Do not Order Plaintiff's reinstatement or instatement as a GS-12.

B. Order the Agency to engage in the interactive process with Hall to reasonably accommodate his disability with reassignment.

C. Award Plaintiff back pay and interest from November 18, 2013 to the present date.

D. Expunge all negative items from Plaintiff's personnel files and records.

E. Order Defendant Agency to award Plaintiff $300,000 in compensatory and punitive damages pursuant to 42 U.S.C. 1981(A)(b).  Order Dettling and FELSC to award Hall $273,411.80 (includes attorney's fees and refund of $15,500.

F. Do not Vacate MSPB's June 2013 decisions.

G. Do not remand to the Board for proceeding on the merits of Plaintiff's mixed case appeal(s).

H. Find the revised settlement agreement void as unconscionable and signed under duress.

I. Imposition of Section 1927 sanctions against any attorney including but not limited to Agency Counsel (Byers-Yates) and FELSC (Dettling) who attempts to unreasonably and vexatiously multiply or derail these proceeding with frivolous filing or ad hominem attacks.

J. Enjoin any third-party participation by Byers-Yates and Dettling or representatives in this proceeding, including the filing or cross claims or counterclaims or amici curiea briefs.

K. Disclosure to the Plaintiff, the Agency Counsel of any attempt by third parties, to interfere with the administration of justice in this case through ex parte communications with the judge assigned to this case.

L. Enjoin all ex parte communication to the judge assigned to this case from third-parties aside from Dettling and Byers-Yates.

M. Imposition of Section 1927 sanctions against any third-party lawyer, who attempt to unreasonably and vexatiously multiply these proceedings with ex parte communication or ad hominem attacks on Plaintiff.

N. Constitutional due process including discovery and a trial on the merits of Counts I - XXVI.

**Exhibit (P)**

## PLAINTIFF'S COMPENSATORY AND PUNITIVE DAMAGES

From December 2013 to the present date, Defendant is liable for the Plaintiff (GS-12, Step 3) not earning salaries and bonuses.

| | | |
|---|---|---|
| -2014 | GS-12, Step 4 | $83,183.00 |
| -2015 | GS-12, Step 5 | $86,564.00 |
| -2016 | GS-12, Step 6 | $90,404.00 |
| -2017 | GS-12, Step 7 | $95,666.00 |
| -2017 | GS-12, Step 7 (Quality Step Increase) | $2,756.00 |
| -2018 | GS-12, Step 8 | $100,576.00 |
| -2014 | Performance Bonus | $1,200.00 |
| -2015 | Performance Bonus | $1,500.00 |
| -2016 | Performance Bonus | $1,700.00 |
| -2017 | Performance Bonus | $2,000.00 |
| -2018 | Performance Bonus | $2,300.00 |
| **Total salaries and bonuses** | | **$467,849.00** |

-------------------------------------------------------------------------------

| | |
|---|---|
| -Promised refund | $15,500.00 |
| -Attorney fees (P. Henry and G. Stephens) | $9,097.50 |
| -Court costs (DC District, Superior, Court of Appeals,) | $1,130.00 |
| -Gas Mileage, Parking, FedEx, Regular and Registered mail, and printing/copier paper | $1,600.00 |
| -Bank Line of Credit (Defendant denied Plaintiff refund of March 2014 retainer fee of $3,500) | $3,500.00 |
| Total refund and miscellaneous expenses | $30,827.50 |
| Mental and Emotional abuse | $74, 735.30 |
| **Total compensatory and punitive damages** | **$573,411.80** |

**Exhibit (P)**

2

**XFINITY Connect**                                    Steven.H.Hall@comcast.ne

⁛ Font Size ⁛

# Re: "Traumatic Stress Injury CA-2 Form

**From :** Steven H Hall <Steven.H.Hall@comcast.net>              Wed, Apr 10, 2013 08:31 AM
**Subject :** Re: Traumatic Stress Injury CA-2 Form                    📎/1 attachment
  **To :** Chris Mills <Chris.Mills@HQ.DHS.GOV>
  **Cc :** Sharon M Lewis <Sharon.M.Lewis@HQ.DHS.GOV>, Steven Hall <Steven.Hall@HQ.DHS.GOV>

Mr. Mills,
As you are aware that I mentioned in block #13 my reasons for submitting my request for Workers Compensation – Mental Stress. I
do not want this sensitive information provided to anyone else within DHS MGMT
because this would be embarrasing to say the least, this information is for you and Ms. Lewis eyes only.
Mr. Hall

**From:** "Chris Mills" <Chris.Mills@HQ.DHS.GOV>
**To:** "Steven H Hall" <Steven.H.Hall@comcast.net>, "Steven Hall" <Steven.Hall@HQ.DHS.GOV>
**Cc:** "Gloria Eskridge" <gloria.eskridge@HQ.DHS.GOV>, "Irene Cutitta" <Irene.Cutitta@HQ.DHS.GOV>, "Sharon M Lewis"
<Sharon.M.Lewis@HQ.DHS.GOV>
**Sent:** Tuesday, April 9, 2013 4:34:26 PM
**Subject:** RE: Traumatic Stress Injury CA-2 Form

Steven,

I received your CA-2 form, however, you did not provide the medical and mental documentation referred to in line 17. I cannot process
the claim until you provide this documentation.

Please forward as soon as possible, so I can complete the Supervisor's Report for your claim.
v/r
Chris

Chris Mills, P. E.
DHS Headquarters , Management Directorate
Office of the Chief Readiness Support Office (OCRSO) /Operations Support (OS),
Director Technical Support and St. Elizabeths Program Manager
(202) 329-8782 (cell)

**From:** Steven.H.Hall@comcast.net [mailto:Steven.H.Hall@comcast.net]
**Sent:** Monday, April 08, 2013 1:42 PM
**To:** Mills, Chris
**Cc:** Eskridge, Gloria; Cutitta, Irene; Lewis, Sharon M; Steven Harold Hall
**Subject:** Re: Traumatic Stress Injury CA-2 Form

Mr. Mills,

I am providing you a Traumatic Injury Workers Compensation CA-2 form in regards to work related stress since February 19, 2013.
After you fill out Part II of this CA-2 form, send to Ms. Sharon Lewis and she will provide it to DoL for processing.  This form is to be
processed in 5 days.  Below is a link regarding this form:

http://webapps.dol.gov/libraryforms/go-us-dol-form.asp?FormNumber=357

Steven

📎 **Medical Documentation.pdf**
    371 KB

1                                                      

**XFINITY Connect**

Steven.H.Hall@comcast.ne

± Font Size ±

---

## Second Workers Compensation CA-7 Claim

**From :** Steven Hall <Steven.Hall@HQ.DHS.GOV>

Tue, Apr 30, 2013 11:51 AM

**Subject :** Second Workers Compensation CA-7 Claim

**To :** 'Steven Hall' <Steven.h.hall@comcast.net>

My claims for Workman Compensation has always been an issue with my supervisors as confirm from the below email.

---

**From:** Lewis, Sharon M
**Sent:** Thursday, February 28, 2013 8:35 AM
**To:** Neigh, Roy; Mills, Chris
**Cc:** Eskridge, Gloria; Steven Hall; Hall, Steven
**Subject:** RE: Second Workers Compensation CA-7 Claim

Roy

Can you please sign the CA-7 and return it to me today.  If not Chris you can sign the form.  I need the form back today.  Remember we have 5 days to get the form to DOL for processing and I do not want this form to get mishandled like the last one.

thanks

Sharon M. Lewis
Human Resources Specialist
U.S. Department of Homeland Security - HQ
Office of the Chief Human Capital Officer
Human Resources & Management Services (HRMS)
Washington, DC 20528-0175
(202) 357-8557  Office
Sharon.M.Lewis@dhs.gov

---

**From:** Hall, Steven
**Sent:** Wednesday, February 27, 2013 5:45 PM
**To:** Lewis, Sharon M
**Cc:** Neigh, Roy; Mills, Chris; Eskridge, Gloria; Steven Hall
**Subject:** Second Workers Compensation CA-7 Claim

Sharon,
I was informed that I will receive a letter from the Department of Labor in about three weeks and I am providing you and my former/current chain of command the requested CA-7 claim from January 18, 2013 through February 18, 2013. My first CA-7 claim was from September 23, 2012 through January 17, 2013 and both time periods Mr. Roy Neigh was my supervisor. On February 19, 2013, I returned back to work at St. Elizabeth's construction site and Mr. Chris Mills became my current supervisor.

Mr. Neigh I am requesting that you complete Part II of the second CA-7 claim and forwarded to Ms. Sharon Lewis. I greatly appreciate your consideration in completing this CA-7 claim.

Very respectfully,

Steven H. Hall
Administrative Specialist for Deputy Chief Readiness Support Office:
Operations Support at St. Elizabeth's
Department of Homeland Security
BB: (202) 536-6017

---

2

EX Q

*Office of the Chief Security Officer*
**U.S. Department of Homeland Security**
Washington, DC 20528



NOV 15 2013

**CERTIFIED MAIL and ELECTRONIC MAIL**
Mr. Steven H. Hall
7141 Chesapeake Village Blvd.
Chesapeake Beach, MD 20732

Dear Mr. Hall,

This letter serves as notification that your access to classified information was reinstated effective September 10, 2013, the date that you signed and submitted the Receipt and Acknowledgement form to this office.

Any questions concerning this matter should be directed to Landis Nicholson, Special Actions Branch Chief, OCSO Personnel Security Division, at (202) 447-5392.

Sincerely,

Kimberly Lew
Chief, Personnel Security Division

3                                  E x ( Q )

XFINITY Connect

---

XFINITY Connect                                                    Steven.H.Hall@comcast.net

± Font Size -

---

Records for 2015-HQFO-00294

---

From : Angela Washington <angela.washington@HQ.DHS.GOV>          Thu, Aug 20, 2015 09:06 AM
Subject : Records for 2015-HQFO-00294                                   ✐1 attachment
    To : steven h hall <steven.h.hall@comcast.net>

Mr. Hall,

Per our conversation, attached is the records responsive to your request.

Please let me know if have any other questions.

Thanks,

Angela Washington
Director of FOIA Production and Quality Assurance
Privacy Office
U.S. Department of Homeland Security
Main: (202) 343-1743
Fax: (202) 343-4011

This communication, along with any attachments, is covered by federal and state law governing electronic
communications and may contain confidential and legally privileged information. If the reader of this
message is not the intended recipient, you are hereby notified that any dissemination, distribution, use or
copying of this message is strictly prohibited. If you have received this in error, please reply immediately
to the sender and delete this message. Thank you

---

2015-HQFO-00294 records.pdf
8 MB

---

4                                    Ex Q

dander. So what we do know is that he is having a physical manifestation of personal anxiety, while we have an unclear mechanism of injury, causal relationship, and entirely conclusory statements and medical – therefore they cannot be construed as reliable, probative and substantial. ECAB and Courts have addressed these as personal feelings and fear of future events, both of which is not covered under the Act. <u>ISSUE #5:  He was not aware of all of his</u> <u>stress disorders until he was informed by his psychiatrist on 03/26/13.</u> Block 15 says he was not aware of all of his stress disorders until he was informed by his psychiatrist on 03/26/13. He has been seen by several doctors, from a care clinic, to children's hospital, to the VA.. A Psychology Practicum Student (student in a program designed to give supervised practical application of previously studied theory) has apparently been treating him at the DC VA Medical Center, and apparently has enlightened him to the fact he has stress disorders for which he didn't know he had before. The Agency believes that claimant statements made, all the way up to the most recent email dated 04/09/13 from the claimant to the agency's workers comp coordinator, sums it up accurately – though the FECA permits the Agency an opportunity to challenge or submit additional information at the beginning of a claim, or during a claim which has been accepted, he is upset that the Agency had disputed the 'already approved workers compensation claim' (252510109) and adds specifically "I want my mental information and workers compensation claim for mental stress to remain undisputed"... meaning this claim. ECAB and Courts have addressed these as personal feelings and fear of future events, both of which is not covered under the Act. Therefore the Agency requests that this claim be disallowed. Thank you for your time in this matter. Sincerely,"

Chris says to me/all (b)(6)

(b)(6)

---

➤ 04/19/13        (S-252515038)
I said "GSA did the outside per our Safety folks. We had the inside done, so I'd keep it in... it's accurate."

➤ Chris says "I haven't seen any on outside testing for this purpose and the construction monitoring at specific locations were not near the trailers. The report we received only addressed indoor air quality. We did not have nor did we provide any outdoor air tests to Steven. I do not believe we should include that language."

I said "Trust me on this one...Karl Anderson and Camille in the DHS Safety office tells me they have it in hand...they verified my statement about the air quality results is accurate, and so we should keep it in. I plan on signing my document myself."

---

04/22/13       (S-252515038)
Sharon emailed me (with a 'read' receipt) "Can you please tell me the status of your letter to DOL on Steven Hall? We are right at our 10 day window."

I said "It has been vetted through Irene and Grace to ensure my presentation of facts is consistent with what they know to be true in their offices' presentations. Here is an electronic copy... the signed copy I am bringing down." It said [April 18, 2013, to DOL, RE: new claim, DOI: 03/20/2013. (CA-2), to CE: Since FECA allows people to file a claim and allege liabilities against the Agency, which many use to legitimize their 'assertions', FECA has established rules, guideline criteria, and Claims Examiner reviews because Workers' Compensation Law is not applicable to each and every injury or illness that is claimed as being related to the federal employment, and in order to preserve and protect Agency expenditures from fraud, waste or abuse in an ever increasing time of furloughs, sequestration, and shrinking government funding. Therefore the Agency is requesting close attention in determining whether the claimant's claimed condition arose out of and within the course of the federal employment or not. <u>SYNOPSIS:</u> The claimant is a current employee of DHS located in Washington DC, and has filed a claim for an Occupational

Ex (Q)

Thanks,


Joanne


_____

From: Byers, Letitia <letitia.byers@hq.dhs.gov>
Sent: Monday, November 23, 2015 2:12 PM
To: Joanne Dekker
Subject: Settlement agreement 11-23-15


REVISED – Use this version.


See 1.g.  I forgot to add the language from the ADEA.


Please forgive the oversight.




Letitia M. Byers

Attorney-Advisor for Labor & Employment

General Law Division

U.S. Department of Homeland Security

Office of the General Counsel

Washington, DC 20528

Tel. (202) 447-3507

Mob. (202) 453-3483

6

Exhibit (Q)

## Hall, Steven H CIV CNIC HQ, N1

| | |
|---|---|
| From: | Joanne Dekker <jdekker@falsc.com> |
| Sent: | Monday, November 23, 2015 14:34 |
| To: | Hall, Steven H CIV CNIC HQ, N13 |
| Subject: | [Non-DoD Source] Fw: REVISED: Fw: Settlement agreement 11-23-15 |
| Attachments: | Settlement agreement 11-23-15.doc |

Hi, Steven,

I need you to sign and return this version of the settlement agreement.  The ones you signed and forwarded do not contain the ADEA language.

Thanks,

Joanne

---

From: Joanne Dekker
Sent: Monday, November 23, 2015 2:14 PM
To: Hall, Steven H CIV CNIC HQ, N13
Cc: Rosemary Dettling
Subject: REVISED: Fw: Settlement agreement 11-23-15

Steven:

Attached is a revised agreement that includes a release of any age discrimination claims that you may have or had.

Please sign and return this version via fax at 540-338-4841 or by return email.

Ex Q

# ATTACHMENT

| | |
|---|---|
| From: | Byers, Letitia |
| To: | Joanne Dekker |
| Cc: | Rosemary Dettling |
| Subject: | RE: Hall v. DHS |
| Date: | Tuesday, November 24, 2015 10:24:11 AM |

Joanne:

The OWBPA clause applies to waiver of any age discrimination claims, which Mr. Hall has not raised in any of his EEO cases. It is the Agency's position, therefore, that the parties have a fully executed agreement, which the MSPB retains jurisdiction for enforcement purposes.

I am available after 11:45 a.m. today for a call with Administrative Judge Hudson should you wish to contact her.

Letitia M. Byers
Attorney-Advisor for Labor & Employment
General Law Division
U.S. Department of Homeland Security
Office of the General Counsel
Washington, DC 20528
Tel. (202) 447-3507
Mob. (202) 495-9485
Fax (202) 447-3111
Letitia.Byers@hq.dhs.gov

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this in error, please reply immediately to the sender and delete this message. Thank you.

From: Joanne Dekker [mailto:jdekker@felsc.com]
Sent: Tuesday, November 24, 2015 8:24 AM
To: Byers, Letitia
Cc: Rosemary Dettling
Subject: Hall v. DHS

Good morning, Letitia.

Mr. Hall has advised us that he wishes to exercise his rights under OWBPA to reconsider the settlement agreement, and as provided by paragraph 1.g of the settlement agreement.

Best regards,

8

Exhibit (Q)

Sent to Ms Dettling on Sat Jul 23, 2016 05:52 PM
Message : Seems to me that Joanne did not sign or accept the certified mail receipt letter today. I
don't have a email version. Leaving Maryland going on vacation now.

Received from Ms Dettling on Sat Jul 23, 2016 05:44 PM
Message : Please also email me the letter you sent Joanne. I will not be in the office next week to
look at it.

Sent to Ms Dettling on Sat Jul 23, 2016 02:50 PM
Message : Can't talk now, but I remember paying you for two MSPB cases; $17K and for four
EEOC cases; $14K all totalling  $31K. I will check my records when I return home tonight.

Received from Ms Dettling on Sat Jul 23, 2016 02:19 PM
Message : Please call me today before 4. I am trying to send you your check but I want to verify
some payments.

Sent to Doris Hernandez on Thu Jul 21, 2016 02:05 PM
Message : K

Received from Doris Hernandez on Thu Jul 21, 2016 02:04 PM
Message : Call my desk

Sent to Doris Hernandez on Thu Jul 21, 2016 12:45 PM
Message : DHS is pissed that the Federal District Court is holding them totally accountable
regarding my Federal complaint. They will have to sue my former attorneys to get their money
back.

Received from Doris Hernandez on Thu Jul 21, 2016 12:01 PM
Message : GM. Whatz up

* Received by: Anita Hall and Steven Michael on Wed Jul 20, 2016 03:17 PM
Message : Sir*

* Received by: Anita Hall and Steven Michael on Wed Jul 20, 2016 03:17 PM
Message : Yes sit

* Sent to Anita Hall and Steven Michael on Wed Jul 20, 2016 03:08 PM
Message : Be safe and enjoy uourself. PoPs

* Received by: Anita Hall and Steven Michael on Wed Jul 20, 2016 03:07 PM

9                                                        Ex (Q)

XFINITY Connect

Steven.H.Hall@comcast.net
+ Font Size -

**From :** Rosemary Dettling <rdettling@felsc.com>

Tue, Aug 16, 2016 04:56 PM

📎1 attachment

**Subject :** <No Subject>

**To :** steven.h.hall <Steven.H.Hall@comcast.net>

**Cc :** Rosemary Dettling <rdettling@felsc.com>

Steven,

This email is sent for settlement purposes only and does not constitute a waiver of the relief I could request from the Court. As I mentioned before, I can request monetary sanctions against you for filing a frivolous case. I can also ask for attorney fees, if I hire an attorney to respond to your complaint. Finally, I can pursue legal fees against you pursuant to our retainer agreements.

Here is my proposal:

I will reimburse you the fees you paid me ($15,500) if you agree to voluntarily dismiss the federal case against me, FELSC, and Joanne. You would also have to ask the Court to strike your complaint from the record. The agreement would include a confidentiality clause, a defamation clause, and an agreement that you drop your claims "with prejudice" — meaning you understand you can't bring them up late in another court. The agreement would also state that the agreement resolves all issues to date. Finally, if you filed a Bar complaint against us, you would have to agree to tell them you voluntarily dismissed the case and asked that the complaint be stricken from the record. You would also have to agree to tell the Bar that you settled the case, and would have to provide them with the settlement agreement and dismissal Order.

This offer is good until Friday at 6 p.m.

I cannot pay you for Mr. Henry's attorney fees, as they were never brought to my attention before. They were not part of the settlement agreement reached in November/December 2015.

The $15,500 is in a trust account because there is a dispute over attorney fees.

Rosemary Dettling, Esq.
Federal Employee Legal Services Center
1629 K Street, NW
Suite 300
Washington, DC 20006
rdettling@felsc.com
Tel. 202-390-4741
Fax 202-379-9772

Unknown <text/html>
4 KB

10

EX (Q)